## UNITED STATES v. THE MEACHAM.

### Misc. No. 715.

United States District Court
E. D. Virginia, Alexandria Division.
Oct. 8, 1952.

998

’ J. Frank Staley, Thomas F. McGovern, Patrick Cooney, Washington, D. C., and William P. Woolls, Jr., Asst. U. S. Atty., Alexandria, Va., for the United States.

Edward R. Baird, Baird, White & Lanning, Norfolk, Va., for respondent.

BRYAN, District Judge.

The United States demands as forfeit the S.S. Meacham, a surplus war-built tanker, for violation of the Shipping Act of 1916, as amended[1], and the ship registry statutes.[2] The charge is that, without permis-

<hr />

1. 39 Stat. 729, 730, 41 Stat. 994, 1008, 52 Stat. 964, 46 U.S.C.A. §§ 802, 808.

2. Rev.Stat. §§ 4143, 4146, 4163, 4172, 4189, 46 U.S.C.A. §§ 21, 23, 33, 41, 60.

sion of the United States Maritime Commission, she was sold to a corporation not a citizen of the United States, in fact a Chinese citizen, and thereafter obtained and retained registry as a vessel of the United States when in truth she was not, thereby incurring the forfeiture penalties of the shipping laws. The vessel has now been sold under the supervision of the Court, and the proceeds of $1,950,000 are held to answer the decree in this cause.

Narration of nearly all the myriad details of this controversy cannot be avoided, for almost every circumstance in the case bears directly upon its decision. To begin with, in 1947 the United States Maritime Commission, in disposing of surplus Government-owned ships, allotted eight tankers to the American Overseas Tanker Corporation, which was incorporated under the laws of Delaware and had only American citizens as its stockholders, directors and officers. Five of these tankers so allocated were under Panamanian and three under United States registry. The last were the Meacham, the Kettleman Hills and the Antelope Hills, and the Meacham alone is the subject of this litigation.

At that time the Chinese National government was in desperate need of tankers to fetch and carry her oil from the Persian Gulf to Shanghai and adjacent ports. Chinese Petroleum Corporation was her agent in the search for tankers. It was a corporation of China and a part of the National Resources Commission of China, a branch of the Chinese Nationalist government. Through Dr. Shiah, in New York City, Chinese Petroleum made repeated applications for tankers to the Maritime Commission, the Navy Department and the State Department, all unavailing. Then it was Dr. Shiah met, and interested in his problem, the China Trading & Industrial Development Corporation, also of Chinese origin and represented in this country by C. Y. Chen and C. C. Wei.

China Trading had been organized in China in 1944 by a group of Chinese belonging to the A Association, a society having for its purpose the advancement of China through the education at home and abroad of young men to study and help solve the needs of China. Shiah, Wei and Chen, in consultation with one P. T. Chin and Darfoon Du, both of China Motor Corporation in New York, sent Du to interview the Maritime Commission towards the procurement of several surplus war built tankers then held for sale. The Commission had in the past sold surplus vessels to aliens, including Chinese, and had approved transfer of them to foreign registry. Although Du's mission had the support of the Chinese Embassy, it was fruitless; it received the answer that no tankers were in hand for foreign ownership. Whereupon the Chinese conceived the idea of causing the organization of a corporation eligible by citizenship to acquire United States flag tankers, to advance to it the necessary funds for the acquisition of the tankers, and thereafter to charter them from the corporation for the Chinese. Their counsel fully advised them of the restrictions placed by the United States upon alien acquisition and ownership of American Ships.

Primarily, the Sale of Surplus War-Built Vessels Act (Merchant Ship Sales Act of 1946),[3] directed that preference in the sales of such vessels be given citizens of the United States. For definition of such a citizen it referred to the Shipping Act of 1916, as amended, sec. 2.

The Shipping Act in sec. 2 explicitly defines corporation citizenship and by sec. 9 rigidly circumscribes, under pain of forfeiture, the unauthorized transfer of a vessel to a non-citizen. So far as relevant these sections read:

Sec. 2. "(a) Within the meaning of this chapter no corporation, partnership, or association shall be deemed a citizen of the United States unless the controlling interest therein is owned by citizens of the United States, and, in the case of a corporation, unless its president and managing directors are citizens of the United States and the corporation itself is organized under the laws of the United States or of a

3. 50 U.S.C.A.Appendix, § 1735 et seq.

State, Territory, District, or possession thereof, but in the case of a corporation, association, or partnership operating any vessel in the coastwise trade the amount of interest required to be owned by citizens of the United States shall be 75 per centum.

"(b) The controlling interest in a corporation shall not be deemed to be owned by citizens of the United States (a) if the title to a majority of the stock thereof is not vested in such citizens free from any trust or fiduciary obligation in favor of any person not a citizen of the United States; or (b) if the majority of the voting power in such corporation is not vested in citizens of the United States; or (c) if through any contract or understanding it is so arranged that the majority of the voting power may be exercised, directly or indirectly, in behalf of any person who is not a citizen of the United States; or, (d) if by any other means whatsoever control of the corporation is conferred upon or permitted to be exercised by any person who is not a citizen of the United States.

"(c) Seventy-five per centum of the interest in a corporation shall not be deemed to be owned by citizens of the United States (a) if the title to 75 per centum of its stock is not vested in such citizens free from any trust or fiduciary obligation in favor of any person not a citizen of the United States; or (b) if 75 per centum of the voting power in such corporation is not vested in citizens of the United States; or (c) if, through any contract or understanding, it is so arranged that more than 25 per centum of the voting power in such corporation may be exercised, directly or indirectly, in behalf of any person who is not a citizen of the United States; or (d) if by any other means whatsoever control of any interest in the corporation in excess of 25 per centum is conferred upon or permitted to be exercised by any person who is not a citizen of the United States."

Sec. 9. "* * * it shall be unlawful, without the approval of the United States Maritime Commission, to sell, mortgage, lease, charter, deliver, or in any manner transfer, or agree to sell, mortgage, lease, charter, deliver, or in any manner transfer, to any person not a citizen of the United States, or transfer or place under foreign registry or flag, any vessel or any interest therein owned in whole or in part by a citizen of the United States and documented under the laws of the United States, or the last documentation of which was under the laws of the United States.

"Any such vessel, or any interest therein, chartered, sold, transferred, or mortgaged to a person not a citizen of the United States or placed under a foreign registry or flag, or operated, in violation of any provision of this section shall be forfeited to the United States, and whoever violates any provision of this section shall be guilty of a misdemeanor and subject to a fine of not more than $5,000, or to imprisonment for not more than five years, or both."

The Chinese were willing to risk the venture and the corporation they conceived became the United Tanker Corporation, chartered in Delaware December 10, 1947. Its directorate consisted of three American citizens, one of whom was elected as president, and another vice-president, C. C. Wei, the Chinese citizen, was made secretary and treasurer. On the same day United filed an application with the Commission for the purchase of two T-2 tankers. The application exhibited the corporate charter and named and biographed the officers and directors, including Wei's citizenship; represented that a majority of its stock was, and would at all times be, held by United States citizens; stated that "substantially all of the capital of the applicant will be contributed by China Trading & Industrial Development Corporation, a Chinese corporation"; disclosed that China Trading was the holder of all of United's A stock; explained that the tankers would be chartered to the National Resources Commis-

sion of the Chinese government to carry oil from the Persian Gulf ports to China; and gave assurance that the vessels would be operated under American registry. Accompanying this application was one by China Trading for tankers for Chinese flag operation. Both were supported by a request of the Embassy of China to our State Department to intervene with the Commission to obtain favorable action. Neither application was granted or rejected. United's was listed by the Commission as a citizen application, and United was notified that if any tankers later became available, its application would be then considered.

In the first part of January, 1948 a ship broker told the group composing American Overseas Tanker Corporation, which held the allotment from the Commission for the three tankers including the Meacham, that she knew of a group who were desirous of procuring tankers. On January 19, 1948 she explained to the AOTC group that her principals might consider payment of a premium of $150,000 for each tanker obtained. Later in the same day she brought the two groups together, the Chinese and AOTC.

AOTC's representatives explained that title to its allotted tankers would have to be taken in another corporation because AOTC had bound itself, in the financing of other tankers, not to engage in any other business. No written agreement was made at the meeting of January 19, but a memorandum of the proposals discussed, apparently acceptable to AOTC, was made by one of the latter group. It noted that American Overseas was willing to consider the sale of the tankers to United, subject to the approval of the Commission; that it was to form a new Delaware corporation to hold title to the three ships, that interests connected with United were to supply the earnest moneys on the purchase of the vessels and would pay, or give indemnity for, the expenses of dry docking, insuring and breaking out the ships, and that United would then complete the purchase by payment of the balance of the purchase price and otherwise comply with the terms of the Commission. In addition, the new corporation would agree to sell to United all of the capital stock of the new corporation for $450,000 plus $25,000 for expenses, this option to be protected by escrow of the stock.

The uncontroverted testimony is that because United involved Chinese interests, both parties insisted that the proposed agreement should meet the approval of the Commission. AOTC's contract for purchase of the tankers was to be signed January 24.

As the events of the days immediately following January 19 seem critical, they will be separately chronicled:

January 22—As testified by them, two of the AOTC group independently and informally talked with the chairman, and two or three of the members, of the Commission separately, explained that they desired to take title to the tankers in the name of a new corporation and thereafter charter them to United, and that United was the same concern which had made a previous application for tankers; that an option would be granted United to purchase the stock of the new corporation. In reply, they say, the chairman and the other members stated they saw no objection to the plan.

January 22—AOTC filed an amendment to its application for tankers requesting to take title to them in the name of National Tanker Corporation (the new corporation), declaring that "National Tanker Corporation has the identical officers, directors, and stockholders of the American Overseas Tanker Corporation", that is, the three American citizens composing the AOTC group, and reciting that the vessels would be registered under the American flag. The amendment was approved.

January 23—National Tanker Corporation was organized under the laws of Delaware, with the same officers, directors and stockholders as American Overseas.

January 24—An agreement between United and National was signed pursuant to the negotiations of January 19. This agreement recited and stipulated that

(a) National, having no assets save $1000 originally subscribed and paid in for

its stock and having no liabilities, would on January 26 execute contracts with the Commission for the purchase of the three tankers;

(b) Representatives of National had discussed with three members of the Commission the substance of this agreement and had been informally advised that its terms were unobjectionable;

(c) United would lend National the entire cost of purchase, including the conditioning and outfitting, of each tanker, estimated to be $2,000,000 per tanker, of which $202,650 would be advanced simultaneously with the signing of the contract of sale for each tanker and the remainder paid when required by the Commission;

(d) For all such advances National would give its notes to United, secured by mortgages on the respective ships as well as by an assignment of the hire from the proposed bareboat charters of the vessels from National to United, after reservation of taxes and expenses;

(e) National would bareboat charter each tanker to United for 10 years;

(f) National would not from January 24, 1948 until the expiration of the bareboat charter, or charters, engage in any business except the chartering of tankers to United, would not encumber its properties save to United, or incur any monetary liability except to United, and would not assign its interest in this contract, use its funds to pay compensation, enter into contracts, issue additional shares of stock, declare dividends, or make payments of any kind;

(g) The assistant treasurer of National would always be a person satisfactory to United, and all checks drawn by National must bear the countersignature of such assistant treasurer.

(h) United represented "that it is a corporation duly organized under the laws of the State of Delaware, that its president and directors are United States citizens, that the holders of the majority of its stock are United States citizens and that this representation will continue to be true and correct during the life of this contract", and vouched the statements as to its citizenship, officers, directors and stockholders as contained in its application of December 10, 1947 to the Commission to be true; and

(i) Both would be released of the agreement if its performance were rendered impossible by the action of the Commission.

(j) $150,000 for each tanker delivered was to be deposited by United in escrow for one year to guarantee performance of the bareboat charter.

January 24—By an attached written agreement the stockholders of National granted United an irrevocable option to purchase all of National's stock at any time after September 15 but not later than October 15, 1948, for a price equal to $150,000 multiplied by the number of tankers acquired by National pursuant to the amended agreement and repeated the representation that members of the Commission had informally advised the stockholders that there was no objection to this agreement.

January 26—United provided National with the deposits of $202,650 for each tanker, and National paid the money to the Commission and signed the contract of sale (dated December 31, 1947) for all three tankers.

January 29—The Chairman of the House Committee on Merchant Marine and Fisheries wrote the Commission inquiring, on rumor, whether American Overseas had an arrangement to sell the tankers to a Chinese company for use under the flag of China.

January 31—This inquiry was passed on to National.

February 2—National advised the Commission that it intended "to bareboat charter these vessels to another American company" and "to retain title to these vessels indefinitely" but that "no statement can be made at this time as to what its position may be with respect to resale at some time in the future."

February 2—Counsel for United telegraphed Commission's counsel for his opinion of the citizenship of United.

February 2—By reply wire and letter Commission's counsel held United to be a citizen of the United States within the

meaning of sec. 2 of the Shipping Act of 1916, as amended.

The sale of the Meacham from the Commission to National was closed May 14, 1948, pursuant to a bill of sale dated April 26, 1948. Meanwhile National signed a 10-year bareboat charter of the Meacham to United, United time chartered her to China Trading for 1 year with option of United to renew yearly, and China Trading had voyage chartered the vessel to Chinese Petroleum for a trip from California to Shanghai, and thereafter for 7 consecutive voyages between the Persian Gulf and Shanghai, with an option from Chinese Petroleum for 7 additional such voyages. The time and voyage charters were mailed to the Commission for approval by C. C. Wei, secretary of United, and attention adverted to the 10-year bareboat charter, which along with the other charters was enclosed. Approval was obtained. In 1949, extensions of the time and voyage charters were allowed.

For the closing of the sale on May 14, $1,900,000 was borrowed from the Chemical Bank & Trust Co., of New York City, upon a note executed by National, United and China Trading, and secured by a first preferred ship mortgage on the Meacham, together with an assignment of all charter hire and all earnings of the Meacham, preferred stock of $200,000 of American Viking Corporation (then owner of another tanker) and the assignment of a letter of credit in the sum of $2,700,000 issued by the Bank of China to cover charter hire due by Chinese Petroleum as the vessel earned the hire. The Bank of China took 49% of this loan but left its management and contract to Chemical.

The Meacham was admitted to registry for coastwise trade on May 14, 1948, as owned by National Tanker Corporation. The affidavit for her registry, made by the secretary of National Tanker Corporation, affirmed that the president and managing directors of National were United States citizens, that no subject or citizen of any foreign state was "directly or indirectly, by way of trust, confidence, or otherwise interested therein, or in the profits or issues thereof", and also embraced verbatim, as fulfilled, the requirements of sec. 2, Shipping Act of 1916, in respect to citizenship for coastal trade. Immediately following her registration the Meacham sailed from California for Shanghai.

During all of this period the capital structure of United was this. It had two classes of stock, A and B. Both were voting stocks. B stock could be held only by citizens of the United States. No shares of A stock could be issued unless, including such issue, there would then be outstanding a greater number of shares of B than A stock. Thus the American citizen shares would always be in the majority. However, A stock was entitled to 90% of the earnings and B to 10%. On dissolution the corporate assets would be distributed, first, to repay the amounts originally paid for the A stock, and then divided 90% to the A and 10% to the B holders.

China Trading had been issued at this time 10 shares of A stock, $100 par, for $200 per share—the whole of that class then outstanding. 30 no par shares of B, the total of that stock extant, had been issued to the three American incorporators and directors, to the extent of 10 shares each, at the price of 20¢ per share. Observe that the United States citizens held 75% of the stock, for which they had paid $6, and the Chinese 25%, for which they had paid $2000, but the ultimate ownership of the assets was 90%, plus, in the Chinese and 10%, minus, in the Americans.

The balance sheet of United in April, 1948 showed gross assets of $1,427,796, but against this was an open account due China Trading of $1,425,790 for moneys advanced, leaving net assets of $2006, the moneys paid in for the A and B stock. The corporate charter was then amended to require any holder of the B stock before transferring it to any other person, to offer it to United at its book value, which at that date was 15¢ per share. The avowed purpose was to insure the retention of this stock in acceptable hands.

By a second amendment, June 18, 1948, the total authorized class B stock was in-

creased to 75,000 shares, 10¢ par, each share of old B stock was exchanged for 2 shares of new, and a preferred stock of $2,500,000 in shares of $100 each was created. Of the preferred, $2,030,000 was issued to China Trading in satisfaction of its advances which in June amounted to that amount. (Later $470,000 was delivered to China Trading for additional advances.) The additional B stock was paid for by China Trading at 10¢ per share but was ordered issued to a new corporation, The China International Foundation, chartered in Delaware on June 4, 1948.

The same Chinese who organized China Trading organized The China International Foundation, Inc., a non-stock, non-profit corporation. Its objects were the furtherance of educational, medical and scientific enterprises in the United States, China and throughout the world, for the benefit of the peoples of the Republic of China. Its control was in a board of trustees whose members had to be citizens of the United States. The incorporators were all American citizens.

To the Foundation, China Trading donated $1,000 in cash in June, 1948 ($2,500 subsequently), all 10 shares of the A stock of United, and paid for the issuance, as already mentioned, of 74,940 shares of the new B stock of United. Afterwards two of the American stockholders donated their shares of B stock to the Foundation, and the third transferred his B stock to the Foundation for the sum of $10,000, paid to him by China Trading.

When the option of United to purchase National's stock was about to expire, October 15, 1948, United obtained an extension of it. For a consideration additional time was granted, the option was taken up in January 1949, and National's capital stock delivered to United.

Dr. Shiah of Chinese Petroleum testified that in the spring of 1949 Nationalist China suffered military reverses, Economic Cooperation Administration aid was discontinued and his company could no longer use the Meacham and other tankers then under voyage charters. Chinese Petroleum defaulted on the charters, which in the interim had been bought by United from China Trading. Chinese Petroleum had advanced China Trading the large sums which it had loaned to United and which United had paid to or for National for the tanker acquisitions and operations. Hence China Trading was obligated to Chinese Petroleum for these moneys, United was heavily indebted to China Trading, and National to United, but United had claims against Chinese Petroleum, and perhaps China Trading, for the former's cancellation of its charters.

A complex settlement of these cross-claims was effected in November, 1949 whereby the Foundation organized the Meacham Corporation, of Delaware, and subscribed to all of its capital stock; Meacham Corporation purchased the tanker Meacham with its notes in part; and Chinese Petroleum wound up with a note of Meacham Corporation in the sum of $1,595,000, which is now held by Chinese Petroleum against the proceeds of sale of the Meacham. Title to the tanker Meacham was assigned to the Meacham Corporation by National on November 7, 1949. It was thought inadvisable to attempt to redocument the Meacham while she was abroad. She first returned to the United States, at Hampton Roads, Virginia, on November 1, 1951 and was libeled in this proceeding before the transfer to the Meacham Corporation was recorded.

The Court is of the opinion that the Meacham must be condemned for her violation both of the Shipping Act and of the registry statutes. The libel has been fully sustained. That she was a Chinese ship, in law and in fact, is obvious from this recitation of the facts.

The agreement of January 24, 1948 between United and National so prostrated National to United as to make United the real and immediate purchaser of the Meacham. National had been reduced to an alter ego of United; National's acquisition of the vessel was United's. An alternative view is that the attached agreement effected a purchase by United of the tanker from National, through the stock

acquisition [4], the formal completion of the sale awaiting only the exercise of the option. Having already paid, or obligated itself to pay, the entire cost of the Meacham, waiver of the option by United was unthinkable, as it meant that United had only a relatively small amount still to pay to become owner of the tanker. Plainly, the January 24 agreements accomplished a transfer of the tanker to United, either from the Commission or from National. In either view there was a transfer of the ship, a transfer from a citizen, within the notice of sec. 9 of the Act. The United States may invoke the statute and enforce it, whether National or the Commission was the transferor.[5]

■■ But the transferee, United, was not a citizen of the United States as intended by secs. 2 and 9 of the Act, whether qualifying for coastal or foreign trade. As used in sec. 2(b, c) the phrases "majority of the stock" and "75 per centum of its stock" in clauses (a), refer to the degree of participation in the earnings, and of right to the assets, of the corporation. This is the common acceptation of such words.[6] The meaning is made clear by the inclusion of "voting power" as the subject of clauses (b) in both subsections. If clauses (a) referred to voting control, there would be no reason for clauses (b). Moreover, the legislative history proves that the Congress was here adding enjoyment and ownership to control as requisites to citizenship. Instantly the Chinese were entitled to 90% of the earnings and ownership of the vessel.

■ But if "majority of the stock" or "75 per centum of its stock", appearing in clauses (a) of section 2(b, c), denote only voting power or control, the remaining condition of the clauses, against any trust or fiduciary obligation in favor of a non-citizen, was not here met in placing a majority or three-quarters of the stock of United in the three American citizens.

These men, however correct in the performance of their duties, necessarily wielded that stock power under a trust obligation to the aliens. This was so because the Americans had only a nominal pecuniary interest at stake—$6 worth—against the millions of dollars put at the disposal of United by the Chinese.[7] Indeed the interest of the three was not as stockholders at all; theirs was a professional interest in maritime operations. Obviously they treated their stock as of slight value. Such a trust, actual though unexpressed, is a bar to corporation citizenship under sec. 2 of the Shipping Act.

■ Again, "control of the corporation" as set forth in clause (d) of subsection (b), and especially "control of *any interest* in the corporation" appearing in clause (d) of subsection (c), sec. 2 of the Act, was breached by the manner in which the Chinese in actuality dominated United's internal affairs. United was inspired and inspirited by the Chinese. Its life-blood was Chinese money. It was a Chinese means to a Chinese end. As already mentioned, Wei's signature as assistant secretary-treasurer of National was necessary for the disbursement of its funds, though these were not large. Wei was also treasurer of United and its moneys could not be withdrawn without his authorization. Wei too was an officer of China Trading. Chen was chief executive of China Trading, a power in United and Wei's superior. The financial accounts of United, and also of China Trading, were in charge of Chang. United had a common office with China Trading and related Chinese companies. The three Americans were brought in for their professional experience and services; they were to contribute nothing else. They directed their attention and ability to the ships of United, and there were many besides the Meacham. The actual "running" of the corporation was in the hands of the Chinese.

4. Central Vermont Transp. Co. v. Durning, 294 U.S. 33, 55 S.Ct. 306, 79 L.Ed. 741.

5. The Northern No. 41, D.C., 297 F. 343.

6. Flink v. Paladini, 279 U.S. 59, 63, 49 S. Ct. 255, 73 L.Ed. 613.

7. Southern Pacific Co. v. Bogert, 250 U.S. 483, 491, 39 S.Ct. 533, 63 L.Ed. 1099.

1006

■ The Commission did not give its approval to the transfer of the Meacham to United. Assuming that some of its members expressed "no objection", this was not the action of the Commission, literally or practically. No request for approval was made of the Commission. The agreements of January 24, 1948 manifest the willingness of United and National to rest upon an informal presentation and an informal approval. The opinion of the attorney for the Commission, in respect to the citizenship of United, was not Commission action. Whatever inferences may be drawn from the individual views of the Commissioners and their counsel, certain it is that none of them intended to approve a sale foreign of the Meacham.

■ The Meacham was condemnable from the day her sale was closed. Passage of the United stock from the Chinese holders to the Foundation did not redeem the tanker. By then she had crossed the Pacific under false colors. The Foundation was a donee and took the ship with notice of her guilt. Furthermore, the Court concludes that the Foundation was itself of such foreign cast as to be ineligible as a citizen of the United States within the Shipping Act. Its beneficiaries were the peoples of China. This conclusion makes the transfer of the B stock, and the subsequent transfer of the Meacham, to the Foundation offensive to the Shipping Act.[8]

■ With respect to the registry statutes, the Court is of the opinion that the transfer accomplished in execution of the agreements of January 24, 1948, certainly on the day of the acquisition by United of National's stock, and the transfer of United's stock to the Foundation, became violations of Revised Statutes, § 4172, 46 U.S.C.A. § 41, when they were not made known as required by that statute. They were transfers "by way of trust, confidence, or otherwise, to a subject or citizen" of a foreign state. Forfeiture is prescribed as the penalty therefor.

■ The Court finds it unnecessary to pass upon the argument of the United States that secs. 2 and 9 of the Shipping Act should be read into the registry statutes. It denies the prayer of the libel for forfeiture under Revised Statutes, §§ 4189, 4146, 4143, and 4163, 46 U.S.C.A. §§ 60, 23, 21 and 33, because those specifications are not clearly sustained by the evidence. The Court denies, too, as without foundation, the set-offs suggested by the respondent in the event of forfeiture; there is no proof that the United States was aware of the foreign complexion of the purchaser of the Meacham when the sale was made.

This memorandum will be adopted as a statement of the findings of fact, and conclusions of law, of the Court, and a decree of condemnation will be entered upon presentation.

---

8. Central Vermont Co. v. Durning, supra.