22 U.S. 391 (1824)
9 Wheat. 391
The MERINO.
The CONSTITUTION.
The LOUISA.
BARRIAS, and others, Claimants.
Supreme Court of United States.
February 20, 1824.
March 5, 1824.
*395 Mr. C.J. Ingersoll, for the appellants.
The Attorney-General and Mr. Kelly, contra.
*399 Mr. Justice WASHINGTON delivered the opinion of the Court.
And, after stating the case, proceeded to enumerate the objections made by the counsel *400 for the appellants, to the several decrees of the Court below.
1. That the regular Admiralty process was not issued in these cases.
2. That the informations do not conclude against the form of the statute.
3. That the District Court of Alabama had not jurisdiction, the seizures having been made, not within the waters of that State, or on the high seas, but within the jurisdiction of a foreign nation.
4. That the acts of Congress, on which these informations are founded, were intended to apply exclusively to the suppression of the salve trade, from the coast of Africa, or elsewhere, for the purpose of holding or disposing of the subjects of the trade, as slaves, and not to the carrying of them, when in a state of slavery, from one foreign country to another.
1. That the proceedings in these cases were not conducted with the regularity usually observed in Admiralty causes, must be admitted. But the Court is of opinion, that all objections of this nature were waived, by the appearance of the parties interested in the property seized, and filing their claims to the same. In each case, a warrant issued to the Marshal to seize the property libelled, and to cite and admonish all persons claiming an interest in the same, to appear before the Court, and to show cause why the same should not be condemned, as forfeited to the United States. This process was returned executed, and claims were interposed for the several vessels and their *401 cargoes, by the asserted owners thereof. Upon the strictest rules which govern in Courts of common law, objections to the regularity of the process, to enforce an appearance, would be considered as removed by the appearance of the party, and pleading to the merits.
2. The second objection is without foundation, in fact, in relation to the information against the Constitution and her cargo; and we think it inadmissible in point of law, in the other two cases; the count relied upon in those informations stating expressly, that the seizure was made for a violation of the 4th section of the act of 1818, the title of which is accurately set forth. For all the purposes of justice, and of notice to the claimant of the charge which he was called upon to answer, this must be deemed sufficient; and the addition of the technical words, contra formam statuti, is altogether formal and unnecessary. In the cases of the Samuel, (1 Wheat. Rep. 9.) and the Hoppet, (7 Cranch, 389.) it was observed by this Court, that technical niceties of the common law, as to informations, which are unimportant in themselves, and stand only on precedents, are not regarded in Admiralty information; the material inquiry in the latter cases being, whether the offence is so set forth, as clearly to bring it within the statute upon which the information is founded.
3. The objection raised to the jurisdiction of the District Court of Alabama, is principally grounded upon the 9th section of the Judiciary Act of 1789, c. 20. which provides, "that the District Courts shall have exclusive original cognizance *402 of all civil causes of Admiralty and maritime jurisdiction, including all seizures under laws of impost, navigation or trade of the United States, where the seizures are made on waters which are navigable from the sea, by vessels of ten or more tons burthen, within their respective districts, as well as upon the high seas." It is contended, that the seizures in these cases, were not made upon the high seas, or upon waters within the District of Alabama, and, therefore, the jurisdiction was not conferred on that Court. The section above recited, marks out, not only the general jurisdiction of the District Courts, but that of the several District Courts in relation to each other, in cases of seizures on waters of the United States, navigable from the sea, by vessels of a particular burthen. If made within the waters of one district, the jurisdiction attaches to the Court of that district, and the suit must be there prosecuted. The jurisdiction, in these cases, is given to the Court of the district, not where the offence was committed, but where the seizure is made. But where the seizure is made on the high seas, the jurisdiction is conferred upon no particular District Court, and it may, therefore, be exercised by the Court of any district into which the property is carried, and there proceeded against. In like manner, if the seizure be made within the waters of a foreign nation, as was done in these cases, cognizance of the cause is given, under the general expressions of the section, as to civil cases of Admiralty and maritime jurisdiction, to the Court of the district into which the property *403 is conducted, and on which the prosecution is instituted. The illegality of the service in this latter case, has nothing to do with the question of jurisdiction, as was decided by this Court, in the case of the Richmond. (9 Cranch, 102.)
4. The last objection involves the merits of these causes. In the case of the Constitution, the counsel for the appellees rely upon the first and fourth counts in the information; and, in the two other cases, on the second count. But, we think, that the first count, in the first of these cases, must be put out of view; because, although it charges a violation of the act of 1794, it states the offence within the words of the act of the 10th of May, 1800, and yet it alleges it to have been committed contrary to the form of the act of 1794, the title of which is specially recited. This was, no doubt, a mistake of the proctor; but it partakes too much of substance to be the foundation of a sentence of condemnation, in a case so highly penal as this is. But, that count is not, in the opinion of the Court, material to the decision of that case, because, we are all of opinion, that the fourth count is fully supported by the evidence in the cause, and warrants the sentence of condemnation pronounced by the inferior Court. This count is strictly within the 4th section of the act of 1818; and so is the second count in the informations against the Merino and Louisa, and their cargoes.
The argument relied upon by the counsel for the appellants, was, that the policy of our laws, from the year 1794, down to the latest act of legislation, has been confined to the suppression of *404 the slave trade, and to prevent, as far as could be done, the bringing into bondage those persons who were free in their own country; and, that since the condition of persons already slaves cannot be changed or made worse, by their removal from one slave-holding country to another, the acts of 1800 and 1818, ought not to be so construed, as to prohibit citizens of the United States being concerned in such removals.
It may well be doubted, whether even the act of 1794, the first which passed upon this subject, can fairly receive the narrow construction which is contended for, since it prohibits the fitting of vessels within the United States, not only for the purpose of procuring from any foreign kingdom the inhabitants thereof, to be transported to some foreign country, to be disposed of as slaves, but also for the purpose of carrying on any trade or traffic in slaves, to any foreign country, apparently embracing the two cases of free persons of colour, whose condition is changed by being brought into a state of slavery, and also persons already slaves, and intended to be used as subjects of traffic. Be this as it may, the language of the acts of 1800 and 1818, leaves no reasonable doubt, that the intention of the Legislature was to prevent citizens of, or residents within, the United States, from affording any facilities to this trade, although they should have no interest or property in the slaves themselves, and although they should not be immediately instrumental to the transportation of them from their native country. By the former of these laws, the offence is made to consist *405 in the employment of a vessel belonging to citizens of the United States, or to persons resident within the same, in carrying slaves from one foreign country or place to another, no matter for what purpose. By the latter, it consists in the taking on board, or transporting from Africa, or from any foreign country or place, any negro, &c., in any vessel, for the purpose of holding or disposing of such person as a slave, or to be held to service, &c., where those acts are performed by citizens of, or residents within the United States.
It cannot be questioned, but that the case of the Constitution, as stated in the information, and proved by the evidence, is literally within the provisions of the latter act. The slaves seized in that vessel, were taken on board of her by a citizen of the United States, in one foreign place, for the purpose of their being held to service or labour. The Court do not feel themselves justified in restraining the general expression of this law, upon the ground of a supposed policy, the reality of which, to say the most of it, is very questionable. The sentence, therefore, of the Court below, in the case of this vessel and her cargo, must be affirmed.
The same decision would, of course, be made in the cases of the Merino and the Louisa, and their cargoes, if it were not for the circumstance, that the second count in the informations against those vessels alleges, that the citizens of the United States, who took the slaves on board at the Havana, did so for the purpose of holding them as slaves, which allegation is not proved by the evidence in those cases. They were taken on board *406 merely as passengers, to be delivered at Pensacola to their owners, or to those to whom they were consigned. The sentences in these two cases must, therefore, be reversed, and the causes remitted to the District Court, with directions to permit the libellants to amend, it being obvious to this Court, from the evidence, that the negroes taken on board of those vessels, were transported for the purpose of their being held to service.
The three remaining cases, present the claims of the asserted owners of the slaves transported in the above vessels, from Havana to Pensacola, which were brought before the Court below, in the form of libels for restitution. To these libels no claims were filed, and the sentence of the Court in each of the cases, was, "that the slaves remain subject to the laws of Alabama;" from which decision appeals were taken; and as they amount, substantially, to a dismission of the libels, it becomes necessary to examine their correctness. The ownership of the slaves, as claimed by the respective libellants, appears to the Court to be sufficiently established. It is in proof, that slavery was, and is, permitted to exist in the Island of Cuba, either by particular ordinances of the Spanish government, or by custom; that the slaves in question were imported into that island from Africa by Antonio de Frias, and were shipped at Havana for Pensacola by these libellants, as their property, under a passport regularly granted by the Governor-General of Cuba; the slaves claimed by the libellants, other than Frias, having been purchased from him by those libellants. It would *407 seem unreasonable to require other or better proof of ownership, in property of this description, than these facts furnish.
The only question, then, is, whether these persons are prevented from claiming restitution of these slaves by any law of the United States. The only act which bears upon this subject, is that of the 10th of May, 1800, the 4th section of which, after declaring that it should be lawful for any of the commissioned vessels of the United States, to seize any vessel employed in carrying on trade, business, or traffic, contrary to the intent and meaning of that act, or the act of 1794, enacts, that "all persons interested in such vessel, or in the enterprise or voyage in which such vessel shall be employed, at the time of such capture, shall be precluded from all right or claim to the slaves found on board such vessel, and from all damages or retribution on account thereof." There can be no question, but that this section is strictly applicable to the claimants of the slaves on board the Merino and Louisa, those vessels having been seized whilst employed in carrying on trade forbidden by the act of 1800, by a commissioned vessel of the United States. The case of the claimants of the slaves on board of the Constitution, is different. That vessel, with her cargo, was seized in the bay of Pensacola by a military officer, and was conducted by his agent to Mobile, for the purpose of being libelled for his use. The 1st section of this act, which declares the forfeiture of any vessel belonging to a citizen of the United States, employed in transporting slaves from one foreign country to another, *408 contains a provision, that the said vessel may be libelled and condemned for the use of the person who shall sue for the same. The right to seize the vessel, and slaves on board, would seem to be a necessary consequence of the right to enforce the forfeiture. The possession of the vessel, then, being lawfully vested in Col. Brooke, at the time she was boarded by the revenue boat, off Mobile Point, it could not, with any propriety, be asserted, that she was employed in carrying on trade, contrary to law, at the time she was so boarded. Her employment in such trade was completely terminated by the first seizure, and she was on her way for adjudication when the second seizure was made. If, under these circumstances, a capture of the vessel could not be legally made by the revenue boat, then the claims of the owners of the slaves on board, is not precluded by the 4th section of the act of 1800; the sentence above quoted applying only to persons interested in the voyage in which the vessel was employed at the time of such capture.
The Court is, therefore, of opinion, that in the case of Antonio de Frias and David Nagle against eighty-four African slaves, the sentence of the Court below is erroneous, and ought to be reversed, and that a decree of restitution ought to be made.
Sentence in the case of the Constitution affirmed. Sentences in the cases of the Louisa and Merino reversed, with leave to amend. Sentence reversed as to the claim of Frias and Nagle, and restitution decreed