**MEACHAM CORP. et al. v. UNITED STATES.**

**No. 6580.**

United States Court of Appeals, Fourth Circuit.

Argued June 8, 1953.

Decided Oct. 8, 1953.

Parker, C. J., dissented.

Thomas B. Gay, Richmond, Va. (Hunton, Williams, Anderson, Gay & Moore, Richmond, Va., Baird, White & Lanning, Edward R. Baird, Norfolk, Va., and H. Merrill Pasco, Richmond, Va., on the brief), for appellants.

Warren E. Burger, Asst. Atty. Gen., and Leavenworth Colby, Special Asst. to the Atty. Gen. (Paul A. Sweeney, Melvin Richter, Cornelius J. Peck, J. Frank Staley, Thomas F. McGovern and Patrick F. Cooney, Attorneys, Department of Justice, Washington, D. C., on the brief), for appellee.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

This appeal is taken from a judgment of the District Court in a suit in admiralty whereby the tanker Meacham, which formerly belonged to the United States, was condemned and forfeited to the United States[1] on the ground that the ship had been transferred to aliens in violation of Sections 2 and 9 of the Shipping Act of 1916 as amended, 46 U.S.C.A. §§ 802, 808, and that the transfer had not been reported as required by R.S. 4172, 46 U.S.C.A. § 41.[2]

---

1. The judgment actually provided for the forfeiture of the sum of $1,950,000, the proceeds of the sale of the ship, which by agreement of the parties were paid into the registry of the court and substituted for the vessel.

2. The provisions of the Shipping Act, 46 U.S.C.A. §§ 802, 808, relied upon as supporting the decree of forfeiture, are as follows:

   Sec. 2. "(a) Within the meaning of this chapter no corporation, partnership, or association shall be deemed a citizen of the United States unless the controlling interest therein is owned by citizens of the United States, and, in the case of a corporation, unless its president and managing directors are citizens of the United States and the corporation itself is organized under the laws of the United States or of a State, Territory, District, or possession thereof, but in the case of a corporation, association, or partnership operating any vessel in the coastwise trade the amount of interest required to be owned by citizens of the United States shall be 75 per centum.

   "(b) The controlling interest in a corporation shall not be deemed to be owned by citizens of the United States (a) if the title to a majority of the stock thereof is not vested in such citizens free from any trust or fiduciary obligation in favor of any person not a citizen of the United States; or (b) if the majority of the voting power in such corporation is not vested in citizens of the United States; or (c) if through any contract or understanding it is so arranged that the majority of the voting power may be exercised, directly or indirectly, in behalf of any person who is not a citizen of the United States; or, (d) if by any other means whatsoever control of the corporation is conferred upon or permitted to be exercised by any person who is not a citizen of the United States."

   Sec. 9. " * * * it shall be unlawful, without the approval of the United States Maritime Commission, to sell, mortgage, lease, charter, deliver, or in any manner transfer, or agree to sell, mortgage, lease, charter, deliver, or in any manner transfer, to any person not a citizen of the United States, or transfer or place under foreign registry or flag, any vessel or any interest therein owned in whole or in part by a citizen of the United States and documented under the laws of the United States, or the last documentation of which was under the laws of the United States.

   "Any such vessel, or any interest therein, chartered, sold, transferred, or mortgaged to a person not a citizen of the United States or placed under a foreign registry or flag, or operated, in violation of any provision of this section shall be forfeited to the United States, and whoever violates any provision of this section shall be guilty of a misdemeanor and subject to a fine of not more than $5,000, or to imprisonment for not more than five years, or both."

   The registry statute relied on, R.S. 4172, 46 U.S.C.A. § 41, is as follows:

   "*Failure to report sale to foreigners.* If any vessel registered as a vessel of the United States shall be sold or transferred, in whole or in part, by way of trust, confidence, or otherwise, to a subject or citizen of any foreign prince or state, and such sale or transfer shall not be made known, as hereinbefore di-

In 1947, after the Second World War, the United States had a surplus of 390 tankers, subject to the control of the United States Maritime Commission. There was at the time a world shortage of these vessels and the Commission proceeded to sell 187 under United States registry, and 203 under foreign registry.

In August, 1947, the American Overseas Tanker Corporation was organized under the laws of Delaware by certain well-known citizens of the United States to acquire some of these vessels, and on August 27, 1947 made application for the allocation of 20 tankers. As a consequence it was allocated five tankers under Panamanian registry and three under United States registry. It financed the purchase of the five through a loan from the Metropolitan Life Insurance Company and chartered them to a subsidiary of the Standard Oil Company of New Jersey, but it was unable to finance the purchase of the remaining three in its own name because of restrictions in its loan agreement with the Insurance Company. In short, Overseas had the privilege of buying three ships but had no money to pay for them.

During the same period Nationalist China was in desperate need of tankers to transport oil from the Persian Gulf to its refineries in China and Formosa, and accordingly Chinese Petroleum Corporation, a Chinese corporation owned by the China Nationalist Government, made application for tankers to the Maritime Commission, the State Department and the Navy Department, but in each instance was refused. This emergency came to the attention of certain Chinese business men resident in the United States who represented the Chinese Trading and Industrial Development Corporation, a Chinese corporation engaged in the export and import business. These men conferred with Chinese Petroleum and proposed that if it would advance $500,000 for each tanker they would try to finance the rest of the purchase money; and with this arrangement in view they also made application to the Commission but were told that no more ships for foreign registry were available.

They then conferred with Houston H. Wasson of Post, Morris & Lovejoy, a firm of attorneys in New York City, and were advised that if a corporation were formed with two classes of stock and the controlling stock was owned by American citizens, the corporation would be deemed a citizen of the United States within the meaning of the Shipping Act. They determined to organize such a corporation and requested the attorney to find the American citizens for the purpose. He secured Harold C. Lenfest, Walter H. Sieling and Arthur M. Tode of New York; and United Tanker Corporation was formed on December 10, 1947 under the laws of Delaware by three members of the law firm. The charter provided for 2,000 shares of stock—1,000 shares of Class A stock of the par value of $100 each, and 1,000 shares of Class B stock without par value, each share to have one vote. The Class A stock was entitled to receive 90 per cent of the earnings, and on liquidation the full amount initially paid in, plus 90 per cent of the remaining assets; and the Class B stock was entitled to 10 per cent of the earnings, and on liquidation 10 per cent of the assets remaining after the preferential payment to the Class A stock. The charter also provided that no Class A stock should be issued if the issue would leave outstanding more A stock than B stock, and further that the B stock could not be transferred except to a citizen of the United States.

On the same day the incorporators elected Lenfest, Sieling and Tode as the

rected, such vessel, together with her tackle, apparel, and furniture, shall be forfeited. If such vessel, however, be so owned in part only, and it is made to appear to the jury before whom the trial for such forfeiture is had that any other owner of such vessel, being a citizen of the United States, was wholly ignorant of the sale or transfer to or ownership of such foreign subject or citizen, the share or interest of such citizen of the United States shall not be subject to such forfeiture, and the residue only shall be so forfeited."

Board of Directors; and the Board elected Lenfest, President, Sieling, Vice President, and C. C. Wei, an alien Chinese, as Secretary and Treasurer. The Board authorized the sale of 10 shares of A stock to China Trading for $200 a share and 15 shares of B stock to the three American citizens at 20¢ a share. In short, the initial investment consisted of $2000 by the Chinese interests and $3 by the American citizens. Later, in January 1948 the Americans increased their investment to $6. All of the checks of the corporation were countersigned by Wei, the Treasurer, or another Chinese citizen. The offices of the corporation adjoined those of China Trading.

Also on December 10, 1947 United made application to the Maritime Commission, as a citizen of the United States, to purchase two T–2 tankers or alternatively three Liberty tankers. The application set out the corporate organization of the applicant and listed the names and occupations of its officers and directors. It also contained the statements that a majority of the stock was held and at all times would be held by United States citizens; that substantially all the capital of the applicant would be contributed by China Trading, whose business activities were described and that it was the intent of the applicant, if the application were granted, to charter the tankers to an agency of the Chinese government to carry oil from the Persian Gulf.

The application was accompanied by a similar one in the name of China Trading and a letter of transmittal indicating that if the application of China Trading were granted, the application of United need not be considered. No action was taken by the Commission on either application but the applicants were told that if any tankers were available at a later date, the applications would be given consideration.

At this juncture the American citizens, who conducted the affairs of Overseas and had obtained the privilege of buying three tankers from the Commission, were brought into contact by a broker with the Chinese citizens who had organized United but had been unable to satisfy their great desire for tankers. In the middle of January negotiations took place between C. C. Wei, D. Du, and C. Chen of the China Trading-United group, under the guidance of their attorney, and the American citizens who represented Overseas; and an arrangement was made under which the Overseas' interests were to receive a bonus of $150,000 for each of the three ships and the Chinese interests would pay the purchase price and get control of the vessels. The main question for decision in this case is whether the transaction, as it was carried into effect, amounted to a transfer of American ships to aliens without the approval of the Commission.

Since Overseas could not take title in its own name, a new corporation, the National Tanker Corporation, was formed on January 23, 1948 under the laws of Delaware by the stockholders of Overseas. They applied to the Commission and were granted permission to amend their application so as to permit Overseas to take title to the three tankers in the name of the new Corporation. National had an authorized capital stock of 1,000 shares but no money except the sum of $1,000 paid for stock at its incorporation. A formal agreement between United and National was executed on January 24, 1948. It provided for the loan by United to National of the cost of the purchase and the cost of conditioning and outfitting each tanker, estimated to be $2,000,000 per tanker, of which $202,650 would be advanced at the signing of the contract of sale for each tanker and the remainder paid when required by the Commission. National was to give its notes secured by mortgages on the respective ships and an assignment of the hire from bareboat charters of the vessels to United. National was to bareboat charter the ship to United for ten years. National agreed that during the life of the charters it would not engage in any business except the chartering of tankers to United and would not incur any monetary lia-

bility except to United or enter into any contracts or make payments of any kind. The agreement also provided that the assistant treasurer of National would be a person satisfactory to United and that all checks drawn by National would bear his countersignature.

In addition, the stockholders of National agreed to place their stock in escrow under an irrevocable option in United to purchase the stock at any time between September 15 and October 15, 1948 for a price which amounted to $150,000 per tanker. On January 26 Chinese Petroleum, which had already agreed to charter the tankers, provided the deposits of $202,650 for each tanker by checks drawn to the Treasurer of the United States which were turned over to National; and National in turn gave them to the Commission at the time that its contract of sale with the Commission for the three tankers was executed.

The Meacham, one of the three tankers and the subject of this suit, was bareboat chartered by National to United and in turn time-chartered by United to China Trading for one year with the option of yearly renewal; and China Trading voyage-chartered the vessel to Chinese Petroleum for voyages from California to Shanghai and between the Persian Gulf and China. These charters were approved by the Commission.

The purchase of the Meacham was financed by a loan which Chen and Wei secured from the Chemical Bank & Trust Company of New York. The bank loaned $1,900,000 secured by a preferred mortgage on the ship, an assignment of the charter hire and earnings of the ship, a pledge of certain collateral held by United, and an assignment of a $2,700,000 letter of credit issued by the Bank of China. The loan was closed on May 14, 1948, and on the same day the sale and transfer of the ship from the Commission to National took place and delivery of the ship was made to the charterers at Seattle, Washington.

By these several steps the transfer of the ship from government to private ownership was accomplished and the nature of the resulting ownership, whether American or Chinese, may be judged. Subsequently, certain changes in the situation took place but they did not materially alter the character of the vessel's ownership and may be stated at this point in order to complete the picture.

China Trading had been originally formed by a group of Chinese citizens who were members of the so-called A Association, a sort of Chinese brotherhood which had been organized by five Chinese students in China in 1935 to improve living standards and to promote the introduction of American technicological methods in their country. The membership of this association came to include persons in various parts of the world, and amongst them the group of Chinese who established China Trading in the hope that profits could be made and devoted to the patriotic purposes described.

In April and May, 1948, while the arrangements for the acquisition of the three tankers were in process, Chen and Wei conceived the idea of setting up in America a foundation for the same benevolent purposes as the A Association; and they suggested to Newbold Morris, a member of the law firm which had organized United, that he participate in the enterprise. They feared that the profits from the operation of the three tankers would be endangered by the Communists in China and they hoped that China Trading would contribute its A stock and that the three American citizens would sell their B stock in United to the Foundation. After the Meacham had been sold and delivered by the Commission, the idea took definite shape, and on June 4, 1948 the China Foundation was incorporated as a non-profit corporation with no capital stock under the laws of Delaware to promote the educational, medical, scientific, literary and humanitarian interests in Delaware, in the Republic of China and elsewhere. The trustees elected to manage the corporation included Morris, Wasson and Lenfest, and nine months later, on February 15, 1949, Morris was elected Pres-

ident, Wasson Secretary and Treasurer, and Tjian, an alien Chinese, Vice President. The charter provided that only Americans were eligible for election as trustees, and subsequently other citizens of the United States were added to the Board. The assets of the Foundation at the beginning consisted of $1,000 in cash and the A stock of the United, both of which were donated by China Trading. Later the charter of United was amended so as to increase the number of B shares (which were bought by China Trading) and to provide for a class of non-voting preferred stock which was issued to China Trading in liquidation of United's indebtedness to it amounting to $2,030,000. The new B stock was donated to Foundation, and Lenfest, Sieling and Tode also transferred their B stock, as hereinafter described, so that ultimately the Foundation came to own all the voting stock of United except the qualifying stock of directors.

Other cash sums were donated to the Foundation and other investments were made by it. Fellowships were awarded to Chinese students in American universities. The officers and directors of the Foundation, under the leadership of Newbold Morris, were citizens of the United States, but citizens of China participated extensively in the Foundation's activities.

It will have been noticed that one of the important features of the agreement between United and National in January, 1948 was an option given by the stockholders of National to sell their stock to United between September 15 and October 15, 1948 for $450,000, that is, $150,000 per tanker. This step was designed to secure the payment of the bonus to the Overseas' interest and also to terminate their last vestige of control of the ship which had already been turned over to United. When September arrived United was in financial difficulties and without sufficient funds to exercise the option and consequently, an extension was arranged under which United paid $100,000 down and the balance in January, 1949, whereupon the stock was transferred.[3]

The last step in the transfer of the ship was taken in the summer of 1949. At that time, Chinese Petroleum on account of communist activities in China was no longer able to use the Meacham and another ship which it had chartered, and gave notice to that effect. Meanwhile controversies between Chinese Petroleum on one hand and China Trading and United on the other had broken out as to their respective rights under the complicated transactions in which they had been engaged. A complex settlement was finally worked out which resulted in the organization of the Meacham Corporation with 1,000 shares which were sold to Chinese Foundation at $1 per share. This wholly owned subsidiary of the Foundation then purchased the ship from National for $1,000,000 which it paid by assuming the mortgage on the ship and giving its notes for the balance. The remaining details of the settlement are not material to this controversy. Suffice it to say that if the original agreement between United and National, which resulted in the transfer of the ship on May 14, 1948, violated

---

3. During 1948 and 1949 the Meacham was operated at a substantial profit but nevertheless United suffered substantial losses. The charter arrangements between United, China Trading and Chinese Petroleum were so made that the bulk of the profits went to China Trading and in its hands were thought by the New York attorneys to be exempt from United States income tax. The charter rate for the bareboat charter from National to United was $1.40 per ton for a period of ten years. The time charter from United to China Trading for twelve months beginning on or about May 1, 1948 was made at the rate of $4.80 per ton. The voyage charter from China Trading to Chinese Petroleum covering the voyage from United States west coast to China in 1948, was at the rate of $15.30 per ton, and the eight voyage charter between the same corporations for voyages between the Persian Gulf and Shanghai were made at the rate of $14.82 per ton. One result of this arrangement was that China Trading made handsome profits in 1948 and 1949 while United lost money.

the statutes, the subsequent dealings which we have described did not save the vessel from forfeiture.

The events that followed the transfer of the ship from National to United did not alter the nature of that transaction which was complete before the Chinese Foundation and the Meacham Corporation were formed. It is, however, noteworthy that in carrying out the latter transaction the Chinese and not the Americans found the necessary money, that steps were taken to safeguard the advancements and loans of China Trading, and control was placed in the hands of American citizens in such a way that as a matter of course they recognized their obligation to conduct the affairs of the corporations in the interests of the Chinese.

The purpose of the statutes, which are set out above in full in the margin, is very clear. The preamble to the Shipping Act of 1916, 39 Stat. 728, explicitly states that it was enacted to establish a United States Shipping Board (now the United States Maritime Commission [4]) to encourage, develop and create a naval auxiliary and naval reserve and a merchant marine to meet the requirements of the commerce of the United States with its possessions and with foreign countries. Section 2 of the Act provided in broad terms that, within the meaning of the Act, no corporation should be deemed a citizen of the United States, unless the controlling interest therein is owned by citizens of the United States, and unless its president and managing directors are such citizens, and the corporation is organized under the laws of the United States or of a state thereof.

This section of the Act was amplified and strengthened so as to prevent evasion of its intent by the Amendment contained in the Act of July 15, 1918, 40 Stat. 900, which sets out the terms of the present statute to the effect that a corporation is not a citizen of the United States within the meaning of the statute, even if the title to a majority of the stock is vested in citizens of the United States, unless they are "free from any trust or fiduciary obligation in favor of any person not a citizen of the United States", or "if through any contract or understanding it is so arranged that the majority of the voting power may be exercised, directly or indirectly, in behalf of any person who is not a citizen of the United States; or if by any other means whatsoever control of the corporation is conferred upon or permitted to be exercised by any person who is not a citizen of the United States."

Section 9 of the statute has also been strengthened and enlarged so as to effectuate the underlying purpose of the legislation. As originally enacted in the Act of 1916, the prohibition against the transfer of a vessel of the United States without the approval of the Board was limited to periods when the United States is at war or during any international emergency, the existence of which is declared by proclamation of the President. See 39 Stat. 731. This language was changed in the Amendment of 1918 so as to prohibit generally the transfer of any vessel to foreign registry without the approval of the Board, even in the absence of emergency or presidential proclamation.

It is especially important to note that the amendatory Act of 1920, 41 Stat. 988, set out more fully the policy that Congress had in view and had already expressed in the preamble to the Shipping Act of 1916. The 1920 statute declared that it is necessary for the national defense and for the proper growth of its foreign and domestic commerce that the United States shall have a merchant marine sufficient to carry the greater part of its commerce and serve as a naval or military auxiliary in time of national emergency, ultimately to be owned and operated privately by citizens of the United States; and the preamble

---

4. Established by the Act of June 29, 1936, 49 Stat. 1987, 2016.

also contained the following express declaration of policy:

> "It is hereby declared to be the policy of the United States to do whatever may be necessary to develop and encourage the maintenance of such a merchant marine, and, in so far as may not be inconsistent with the express provisions of this Act, the United States Shipping Board shall, in the disposition of vessels and shipping property * * * keep always in view this purpose and object as the primary end to be attained."

Finally, the sweeping language of § 9 as it now appears was adopted by the Act of June 23, 1938, 52 Stat. 964, so that in any case it is unlawful without the approval of the Commission to sell or transfer to any person not a citizen of the United States any vessel or interest therein, owned in whole or in part by a citizen of the United States and documented under the laws of the United States.

█ It becomes abundantly clear upon an examination of the facts in the instant case, that these statutes were designed to preclude the very arrangement, contrived by the New York lawyers, whereby title to the ship was taken in the name of an American corporation, while the beneficial interest and actual control were passed to citizens of China. The violation of the statutes occurred on May 14, 1948 when the transfer of the ship by National to United, contemporaneously with the sale of the ship by the Commission to National, was made without the approval of the Commission. A number of elements which entered into these transactions and shaped the form of the transfer from National to United are listed by the appellants as indicating that the commands of the statute were not violated and that in the eye of the law the ship never passed into alien hands. But in our view all of these circumstances, taken singly or as a whole, do not warrant this conclusion.

█ We are not embarrassed by the difficulty that sometimes confronts the courts of deciding whether the separateness of a corporate entity from its stockholders should be observed. That difficulty has been solved by the explicit direction of Congress that for the purpose of the statute a corporation is not a citizen of the United States, if its citizen shareholders hold their stock *under any trust or obligation in favor of aliens, or if by any understanding or any means whatsoever control is permitted to be exercised by any person not a citizen of the United States.* We are therefore compelled to observe the substance rather than the form of the transaction.

█ To the factual question in this case only one reasonable answer can be made. One has only to be told that the Chinese raised six million dollars and the Americans six dollars in order to conclude, at least tentatively, that the Chinese dominated the enterprise; and when the details of the picture are filled in the conclusion becomes irresistible. The whole case for the defense rests upon the participation of Lenfest, Sieling and Tode, three responsible citizens of the United States, in the affairs of the United Corporation. They were its three directors and two of them were its president and vice-president respectively, whilst W. C. Wei, an alien Chinese, was secretary and treasurer with the duty of countersigning the company's checks. The three Americans also held a majority of the voting stock, for which they paid six dollars, and were entitled to ten per cent of the corporate gains. But the evidence shows that this titular control was given them with the expectation that they would exercise their power in the interests of their Chinese associates and that they acted accordingly. They did not originate the enterprise but came into it at the behest of the New York lawyers who owed their first duty to their Chinese clients, and loyally recognized this obligation throughout the maze of operations that subsequently developed. The testimony

shows that at every step the interests of the Chinese were served by the lawyers and by the three American shareholders under their guidance.

It is significant that the Chinese rather than the Americans took the lead when important steps were to be taken in the prosecution of the business. The Chinese made the first attempts to obtain tankers from the Commission in order to serve National China; when they were unsuccessful they employed the New York lawyers to find a way through the stone wall of the statutes; and they put up the sum of $2,000 at the time of the incorporation of the United as against $3 subscribed by the Americans. C. C. Wei, Darfoon Du, and P. T. Chin, Chinese aliens, had the initial talks with the broker which led to the negotiations with Overseas and the acquisition of the three tankers; and when these negotiations came to a head in Wasson's office on January 19, after United had been hastily incorporated, two or three Chinese, including Wei and Chin, participated, but, of the Americans, only Lenfest was present. On January 24, 1948 after the incorporation of National, when the contract between United and National was signed, the three Chinese were present, but only Lenfest of the Americans. On January 26, 1948, when it was necessary to make the initial deposits of $202,650 for each tanker, Chinese Petroleum furnished the money. The unsuccessful application to the Bank of America in March 1948, for a loan to complete the purchase of the ship was made in the name of Chinese Trading; and in that application not only was it stated that National was formed to furnish the American citizenship required by the Maritime Commission, but that the corporation would be dissolved at the end of six months and its stock transferred to China Trading. Lenfest, Sieling and Tode had nothing to do with the negotiations for this loan. When the same matter was later taken up with the Chemical National Bank, Chen produced a letter of introduction from the Bank of China and, together with Wei, conducted the negotiations, which resulted in the foregoing loan. Lenfest sometimes was present during the negotiations. It is obvious that the very existence of United as a going concern was dependent upon the financial support of the Chinese.

The services actually rendered to the corporation by Lenfest, Sieling and Tode, and the compensation which they received, are shown by their own testimony. They came into the enterprise to give it an American complexion, Lenfest first, at the request of Wasson, and later Sieling and Tode through the procurement of Lenfest.

Lenfest became the president of the corporation and was the most active of the three Americans in attendance upon directors and staff meetings, but he did not take the initiative in the conduct of the business. He said that every move in the arrangements was explained to him so as to satisfy him that the interests of United were protected; but he relied particularly on Wasson to handle the job. Everything was presented to Wasson, "and he wrapped it up and if it was workable, it went through." The rest of them pitched in and helped. The various actions of the stockholders, in changing the types of stock of United Corporation, were not suggested by Lenfest but by Wasson who worked them out in detail and Lenfest was willing to go along on Wasson's advice.

Lenfest was a marine man of thirty years experience in various branches of marine activity. It was understood that Sieling's firm would operate the ships and that Lenfest would give the necessary time to see that the corporation was properly managed. He was particularly interested in improving the physical operations of the ships and contributed expert advice to that end. In 1948, 1949 and 1950 he received a salary of $10,000 a year, and he got an increased salary in 1951. In 1948 he sold his stock to China Trading for $10,000 with the understanding that China Trading would donate the stock to Chinese Foundation. He was entitled to share in

10 per cent of the profits of the corporation as one of the holders of the B stock, but no accounting of the gains was made and that element did not enter into the sale of his stock.[5]

Sieling also had extensive experience in the management of ships and was a partner in the firm of Sieling and Jarvis which was engaged in that line of business. He was absent from the United States between February and April of 1948 but attended corporate meetings when he was in this country. He handled United's tankers and prepared them for their voyages, advancing funds when it was necessary to do so. He received a salary of $10,000 in 1950 and was later paid at the rate of $15,000 per year. At the end of 1950 he donated his shares of stock to the Foundation at about the same time that he received the $10,000 salary for that year. He waived his right to share in 10 per cent of the earnings of the corporation but apparently looked for some compensation in this respect.

Tode was a consulting marine engineer of long experience. He attended the first organization meeting of the company on December 10, 1947, but was out of the country from January 9 to June 4, 1948, and did not attend another meeting until June 17, 1948 when the voting control of the corporation was transferred to the Chinese Foundation. His attendance upon meetings in 1949 and 1950 was infrequent. His services consisted in inspecting the ships at various places including New York, Philadelphia and Baltimore, but these services were rendered after October 31, 1950. He received director's fees of $30 for each meeting that he attended, and received $10,000 for his services during each of the years 1948, 1949 and 1950. He donated his stock in United to the China Foundation in December, 1950.

Lenfest, Sieling and Tode were not in reality investors or directors of the affairs of the corporation. They were American citizens of substance, of long experience in the shipping business who lent their names and citizenship to give the corporation a domestic flavor and rendered expert services in the management of the ships, for which they received salaries and not 10 per cent of the profits of the business to which they were entitled under the certificate of incorporation. They had, in effect, the same obligation to conduct the business of the corporation in the interest of their Chinese associates who put up all the money, as did the distinguished law firm whom the Chinese retained and they acted accordingly. Judge Bryan was correct when he said in his opinion in this case in the District Court: "These men, however correct in the performance of their duties, necessarily wielded that stock power under a trust obligation to the aliens." 107 F.Supp. 997, 1005. It follows that the controlling interest in United was not owned by citizens of the United States and that the transfer of the ship, without the approval of the Commission, was a violation of the statutes.

■ The appellants make the additional contention that the Commission approved the transfer of the ship to the Chinese, in effect, by delivering the bill of sale to National with notice of all the relevant facts. The argument comes with little grace from parties who could readily have submitted the whole matter to the Commission for formal approval but preferred instead to by-pass the Commission by an elaborate plan that was bound to provoke doubts as to the citizenship of the corporation.

All of the relevant facts set out in this opinion, however, were not laid before the Commission; and those that were communicated were not offered in such a way as to require the Commission to determine whether citizens of the United States or aliens actually controlled the corporation. The Commission had no occasion to examine the

---

5. As shown above the transactions between United and China Trading were so arranged that the bulk of the profits went to China Trading.

statements in the original application of United that substantially all the capital of the company would come from Chinese sources, and that the ship would be used in the carrying trade for China. The charter of the vessels to Chinese corporations was, however, subsequently approved, but, even then, the Commission was not told that the American stockholders contributed only $6 to the enterprise and were to get 10 per cent of the gains, or that the persons who controlled the Overseas and National Corporations were to be paid a bonus of $150,000 for turning over each of the ships without risking a dollar in the enterprise.

The evidence shows that prominent men connected with Overseas and National did sound out separately certain members of the Commission as to the validity of the proposed arrangement by giving them oral and incomplete accounts of plans, and that they reported that the Commissioners consulted had no objections, but, of course, these responses did not and could not amount to that approval by the Commission which is contemplated by the statute. Individual and separate expressions of opinion by members of a group which constitutes a legal entity do not amount in law to action taken by the group when assembled in formal session. For the details of these communications one has only to examine the testimony of Julius C. Holmes, an interested witness, who subsequently sold his National stock to United. He had one conversation in January, 1948 with the Chairman of the Commission and gave his recollection of it four years later. There were also informal talks by other persons with two or three of the Commissioners, whose names are not given. There was, however, no attempt to get action by the full Commission, which could have been as easily secured as informal interviews with individual Commissioners.

Furthermore, all the facts were not disclosed. The Chairman of the Commission testified before a Committee of the House of Representatives that he understood that, even if the option given to United to purchase the National stock was executed, the stock would go to a corporation which was slightly over 50 per cent owned by Americans; and he also testified before a Senate sub-committee that he did not know that it was the intention of Overseas to sell the three tankers at a profit. He received the impression from what was told him that National intended to remain in the tanker operating field.

■ When doubts arose in the minds of the lawyers who were advising the Chemical National Bank as to the mortgage on the ship and the loan of money to purchase it, the opinion of the Assistant General Counsel of the Commission was sought and he expressed the opinion that the requirements of citizenship of the United States, within the meaning of the Shipping Act, were complied with by the United Tanker Corporation. This opinion, however, was not based on the full knowledge of the facts now before the court and is, of course, without legal validity as an act of the Commission. It was neither authorized by the statute nor by the Commission, and appears to have been merely a voluntary act to further the interests of persons who had the Commission's confidence.

A strong light is thrown upon the true nature of the whole business by comparing the situation that would have existed if the Commission had granted (instead of failing to act upon) United's original application, and the situation which ensued when United got the ship from National in the roundabout method actually employed. In either case the result would have been substantially the same.

Under the first alternative, title to the ship would have vested in United, a corporation, a majority of whose voting stock would have been acquired by American citizens without cost and held by them for the benefit of the Chinese who put up the money. Under the actual arrangement, title to the ship

was taken by National which for this purpose stood in the shoes of Overseas; but the Overseas—National stockholders—put up only $1,000, about enough money to cover incorporation and legal expenses of the subsequent transfer to United; while the Chinese in the United-China Trading group, through cash advanced and money borrowed, furnished $6,000,000 to buy the ships and took an agreement on the part of National not to engage in any other business; and United got possession of the ships together with an option to buy the stock of National for $450,000, the amount of the bonus that went into the pockets of the Overseas' stockholders. Meanwhile, United controlled National's expenditures through an assistant treasurer named by United. In short, National, which in the beginning was the creature of Overseas, became the *alter ego* of United, subject to the dictation of the aliens that controlled the latter corporation. Manifestly, a government authority which was unwilling to sell the ships directly to United would have been unwilling to sell them to United by the indirect method, if all the facts had been placed before it.

The appellants assert, for the first time on this appeal, that the District Court had no jurisdiction to entertain the libel of forfeiture for the technical reason that the vessel was not seized by executive authority before the libel was filed. The United States instituted the libel on November 9, 1951 in the District Court of the Eastern District of Virginia and on the same day a warrant of seizure and a monition was issued by the court and executed by the United States marshal by attaching the vessel on navigable waters at Newport News, Virginia, and by giving notice to all persons claiming the same that the court would proceed on November 23, 1951 to the trial and condemnation of the vessel unless a claim should be interposed. The Meacham Corporation filed its claim as claimant on November 15, 1951 and filed an answer in which it expressly admitted the admiralty and maritime jurisdiction of the court. Later it applied for and secured an order of court releasing the vessel upon the payment of $1,950,000 into the hands of the clerk of the court to stand in place of the vessel.

■ The contention now advanced is based on a decision of the Supreme Court in 1815 in The Brig Ann, 9 Cranch 289, 3 L.Ed. 734, which interpreted § 9 of the Judiciary Act of 1789. This decision was later restricted if not repudiated in the case of The Eagle, 8 Wall. 15, 19 L.Ed. 365. The question was revived by the revisers in 1873 by providing in R.S. § 734 that proceedings on seizures for forfeiture under the law of the United States made on the high seas should be prosecuted in any District in which the vessel was brought and proceedings on seizure within any District should be prosecuted in the District where the seizure was made. The revisers pointed out, R.S.1872, p. 425, that the statute regulated the jurisdiction of the District Courts as amongst themselves. The same provision was carried into § 45 of the Judicial Code, 28 U.S.C. § 106. It was repealed, however, in the 1948 codification and now appears in Ch. 87 under the caption "District Court; Venue." as 28 U.S.C. § 1395. It provides that a proceeding in admiralty for the enforcement of forfeitures against a vessel may be brought in any District in which the vessel is arrested. Obviously, the provision is directed to venue rather than to jurisdiction in the technical sense. It was so regarded prior to the codification of 1948 in the decision of The Lucky Lindy, 5 Cir., 76 F.2d 561; and even when executive seizure was thought a necessary preliminary to forfeiture proceedings, it could be waived by action of the parties. See The Abby, 1 Fed.Cas.No.14, page 26; The Lewellen, 15 Fed.Cas.No.8,307, page 444. See also The Merino, 9 Wheat. 391, 400, 6 L.Ed. 118; The Conejo, 1 Cir., 16 F.2d 264; The Rosalie M., 5 Cir., 12 F.2d 970.

■■ The appellants also contend that § 2 of the Shipping Act is unconstitution-

al because it constitutes a deprivation of property without due process of law in violation of the Fifth Amendment, in that the conditions set out in § 2 with respect to corporate citizenship are too vague, and that § 9 of the Shipping Act is unconstitutional because it is an invalid attempt to delegate the legislative power of Congress to the Commission without prescribing standards to guide or limit the Commission's decisions. Neither of these contentions can be sustained. The first is disposed of by prior decisions of the courts. See Central Vermont Transp. Co. v. Durning, 2 Cir., 71 F.2d 273; Id., 294 U.S. 33, 55 S.Ct. 306, 79 L.Ed. 741. There can be no doubt of Congress' power to regulate the transfer of American vessels to foreign ownership; and a more explicit and painstaking attempt to define what is meant by citizenship than is contained in the statute can hardly be imagined.

The contention that § 9 is invalid because of lack of proper standards to guide the Commission's action in approving or disapproving the transfer of American vessels to aliens is likewise without merit. We have heretofore reviewed the legislative history of the Shipping Act of 1916 and noted the clear and explicit statement of policy in the preamble to that act, and in the amending Act of 1920, to the effect that the United States desires to do whatever may be necessary to develop its merchant marine, and that the Shipping Board, now the Maritime Commission, in carrying out its duties under the statute shall always keep in view this purpose and object as the primary end to be attained. The Supreme Court in many cases has held that such a declaration of policy constitutes a sufficient definition of standards. See National Labor Relations Board v. Gullett Gin Co., 340 U.S. 361, 362–363, 71 S.Ct. 337, 95 L.Ed. 337; Lichter v. United States, 334 U.S. 742, 785, 68 S.Ct. 1294, 92 L.Ed. 1694.

Affirmed.

PARKER, Chief Judge (dissenting).

I do not think that the forfeiture decreed by the court below is justified. The case before us is not one in which rescission of an agreement is asked on the ground of fraud or mistake, or one involving conspiracy to evade the law, but one to forfeit a vessel on the ground that the sale thereof was not approved by the Maritime Commission even though it appears that the sale which is relied upon as the basis of forfeiture was made by the Commission itself. I cannot concur in the view that the government, after making the sale of the vessel through the Maritime Commission, can retain the price paid and then have the vessel forfeited on the ground that the Commission did not approve the sale which the Commission itself made. If the sale was induced by fraud or misrepresentation, this would be a ground for rescission and might furnish a basis for a prosecution for fraud; but it would not furnish ground for forfeiture under the statute relied on, since it cannot reasonably be said that a sale made by the Commission was made without the approval of the Commission.

The facts which I regard as controlling in the decision of the case are undisputed and may be briefly stated. Some years ago there was organized by young Chinese students a patriotic organization known as the "Association for the Advancement of Constructive Enterprises", or more briefly as the "A" Association, having for its purpose the formation of enterprises the profits of which would be used "to promote scientific, educational, literary and medical developments for the benefit of the Chinese common people". One of the enterprises brought into being by this association was the China Trading and Industrial Development Corporation (hereafter called China Trading), a Chinese corporation engaged in the export and import business in this country and in China. Two young Chinese, C. C. Wei and C. Y. Chen, were prominently con-

nected with both the "A" Association and China Trading.

In late 1947, the Chinese Petroleum Corporation (hereafter called Chinese Petroleum), an agency of Nationalist China, was greatly in need of vessels to transport petroleum from the Persian Gulf to Chinese ports; and Chen and Wei conceived the idea that they could make money for China Trading and further the objects of the "A" Association if they could have China Trading arrange for the chartering of vessels to Chinese Petroleum. With this end in view they employed American counsel who organized the United Tanker Corporation (hereafter called United) under the laws of Delaware and in behalf of that corporation and China Trading made applications to the Maritime Commission for the purchase of tankers which the Commission was authorized to sell. United was chartered December 10, 1947, with two classes of stock, A and B, the investment in both classes of which was insignificant in amount, there being 10 shares of class A stock for which China Trading paid $2,000 and 15 shares of Class B stock held by citizens of the United States for which they paid 20 cents per share.[1] The shares of class B stock had equal voting power with shares of class A, and the charter provided that class B stock could be held only by citizens of the United States. The charter provided also that class A stock should be entitled to 90% of the earnings of the corporation and class B to 10% and that in case of liquidation class A should be repaid the original investment plus 90% of the remaining assets and class B 10% of the remaining assets. The class B stockholders, three in number, were experienced American shipping men, and they were the directors of the

corporation and held all of its offices except that of secretary and treasurer, which was held by Wei.

Neither the application of China Trading nor of United was acted upon by the Commission, not because it was thought that they were not entitled to purchase vessels but because no vessels were available for allotment for sale to them. In December 1947, Chen and Wei learned that three tankers had been allotted for sale to the American Overseas Tanker Corporation and as a result of negotiations with that corporation agreed to pay it a bonus of $150,000 for each of the three tankers if they could be transferred in such way that they could be chartered as American flag vessels for use by Chinese Petroleum. American Overseas could not purchase the tankers from the Commission because of the restrictions of a contract into which it had entered with the Metropolitan Life Insurance Company in financing other tankers which it had theretofore purchased. The officers of American Overseas caused another corporation to be chartered, however, called the National Tanker Corporation (hereafter called National), and had the right to purchase the three tankers transferred to it. National was chartered under the laws of Delaware and all of its stockholders, directors and officers were citizens of the United States, being the same persons who were stockholders, directors and officers of American Overseas. Although it had only a nominal paid in capital of $1,000, it proceeded to purchase the three tankers which were worth between a million and a half and two million dollars each, paying for them with funds furnished through United by China Trading and with proceeds of loans obtained from the Chemical Bank and Trust Company of New York in

1. The class B stock was later increased to 30 and then to 75,000 shares and 25,-000 shares of preferred stock were issued and delivered to China Trading for moneys it had advanced; but the class B stock constituted at all times a majority of the outstanding shares of stock and had the voting control of the corporation. After the A and B stock of United was acquired by the Foundation it was converted into a single class of common stock which controlled the corporation not only because it constituted a majority of all the shares of stock outstanding but also because the preferred stock had no voting power.

which the Bank of China had a 49% participation.

Before obtaining title to the Meacham, National had entered into a contract with United by the terms of which United was to be granted a bareboat charter on the vessel for ten years at a rate which by the end of that period would return the amount of the investment in the vessel. Similar charters were to be executed with respect to the other vessels, and the stockholders of National agreed to give United an option to purchase their stock in National at a price equal to $150,000 for each of the vessels so purchased by National and chartered to United, option to be exercised between September 15 and October 15, 1948, and in the meantime the stock of National to be placed in escrow. For the protection of United, National agreed that it would engage in no other business and that the assistant treasurer of National would be a person satisfactory to United and that his signature would be essential to the validity of National's checks.

The bareboat charter was duly executed by National to United in accordance with this agreement. United thereupon executed a time charter to China Trading and China Trading executed voyage charters to Chinese Petroleum. It is clear that China Trading intended that a large part of any profits derived from the enterprise should be used for the purposes of the "A" Association, for almost immediately after the charters were executed, Chen and Wei caused a non-stock corporation, known as the China International Foundation, to be formed under the laws of Delaware, with a group of distinguished American citizens as members and trustees, to provide scholarships for the education of Chinese youth in the United States and to make expenditures for the scientific and cultural advancement of the Chinese people. All of the voting stock of United was transferred to the Foundation, China Trading transferring its class A stock and acquiring for the Foundation and having transferred to it all of the class B stock, which at that time amounted to 75,000 shares. This was in June 1948. Other gifts were made to the Foundation by China Trading, but they are not material to this controversy.

Charter rates declined in 1948 and United was not able to exercise the option for the purchase of the stock of National between September 15 and October 15, 1948, in accordance with the terms of the option, and was obliged to ask for an extension. This was granted by the owners of the stock of National upon the payment of $100,000 in cash and the giving of security to secure the balance of the option price. Not until January 1949 did United exercise its option to purchase the stock. The tanker Meacham continued to be owned by National until November 1949, when it was transferred to the Meacham Corporation, a wholly owned subsidiary of the Foundation, pursuant to a settlement of indebtedness had between the various parties who had been connected with the chartering of the vessel.

From the time of the acquisition of the Meacham by National and the execution of the bareboat charter to United, the vessel had been operated by Sieling and Jarvis, an American firm, as managing agents for United, Mr. Sieling of that firm being one of the directors and stockholders of United. The time charter by United to China Trading and the voyage charters by China Trading to Chinese Petroleum were approved by the Maritime Commission, which had before it at the time of the approval the bareboat charter from National to United. The Commission had before it at the time of the sale of the vessel to National information to the effect that the bareboat charter was to be executed by National to United, that United was being given an option to purchase and that the money for the purchase of the vessel by National was being supplied by Chinese interests.

On the facts as stated, I think it clear that no forfeiture of the vessel was incurred either under the Shipping Act or

the registry statutes. The vessel was transferred to National by the Maritime Commission itself; and, even if National be regarded as an alter ego of United and United as a non-citizen, it cannot be said that a transfer that the Commission itself made was made without the approval of the Commission. If the transfer had been obtained by fraud, this might furnish a basis for rescission or for a criminal prosecution for conspiracy to defraud the United States, but not for forfeiture on the ground of transfer without approval. It is elementary that "forfeitures are not favored; they should be enforced only when within both letter and spirit of the law." United States v. One 1936 Model Ford V-8 De Luxe Coach, 307 U.S. 219, 226, 59 S.Ct. 861, 865, 83 L.Ed. 1249. Furthermore, National was clearly a citizen within the meaning of the statute. All of its stockholders and all its officers, except an assistant treasurer, were citizens of the United States. It was not, as suggested, an alter ego of United, but of American Overseas Tanker Corporation, having been organized by American Overseas because that corporation was precluded by its contract with Metropolitan Life from handling the vessels. It was used as a means of collecting for the stockholders of American Overseas the profit which was expected from the dealings with United.

National continued to hold title to the Meacham from the time of the sale by the Commission in May 1948 until the transfer to the Meacham Corporation in November 1949. The bareboat charter to United in the meantime is certainly no ground of forfeiture under the statute; for the sale by the Commission to National was with knowledge on the part of the Commission that the bareboat charter was to be executed. This is established beyond peradventure; and the sale of the vessel under such circumstances was certainly approval by the Commission of the proposed bareboat charter. In addition to this, the Commission expressly approved the time charter by United to China Trading and the voyage charters by China Trading to Chinese Petroleum, having before it at the time the bareboat charter to United; and this was certainly sufficient approval of the bareboat charter to preclude forfeiture under the statute. The only reason that approval of that charter was not expressly asked and given was that everyone concerned, including counsel for the Commission itself, regarded United as a citizen corporation within the meaning of the statute.

When title was transferred by National to the Meacham Corporation in November 1949, this transfer was not to an alien corporation but to a domestic corporation, the president and directors of which were American citizens and all of the stock of which was owned by the Foundation. As heretofore stated, all of the members and trustees of the Foundation were American citizens. The fact that they were to use the funds of the Foundation for the benefit of Chinese students and for the scientific and cultural advancement of the Chinese people detracts not one iota from their American citizenship or from that of the Foundation. A domestic philanthropic society does not lose its status as such because its funds are to be used in other countries. No one would contend, I think, that an incorporated American missionary society is to be denied the status of a citizen under the statute because its funds are to be expended for the benefit of people in foreign lands.

There has been much argument pro and con as to the citizenship of United when tested by the criteria laid down in the provisions of the Shipping Act; but, in the light of what has been said above, it seems clear that the citizenship of United is not vital to the decision of the case. United at no time had title to the Meacham or even an option to purchase that vessel; and, even if the option to purchase the stock of National be equivalent to an option to purchase the vessels owned by National, a propo-

sition to which I do not subscribe,[2] it is clear that an option is not a transfer of title but merely an agreement which may lead to a transfer if the option is exercised. When the option on the National stock was exercised by United, all of the voting stock of United was held by the Foundation which unquestionably complied with the citizenship requirements of the statute, so that United was a citizen corporation; but it should be remembered that the transfer of the vessel was not to United but to the Meacham Corporation, a wholly owned subsidiary of the Foundation.

I think, however, that United was from the beginning a citizen of the United States within the meaning of the statute. This was the view of counsel for the Commission who had the facts before him. It was also the view of some of the ablest and most distinguished law firms of the country in handling matters of great importance to the clients whom they represented; and I find nothing in the record upon which to base a contrary conclusion. The fact that Chinese interests supplied the capital upon which United operated is not material, and I think it equally irrelevant that the class A stock, held by the Chinese, was to receive nine-tenths of the profits of the corporation, whereas the class B stock, held by citizens of the United States, was to receive one-tenth, and that upon dissolution the assets were to be divided in like proportion. This was merely giving to the class A stock some of the qualities of preferred stock, not taking the control of the corporation from the class B stock, which represented a majority of the voting power.

It is the control of the corporation which counts under the statute, not the investment of funds or the right to earnings. Section 2(a) of the statute provides that for a corporation to be a citizen within its meaning the "controlling interest" in the corporation shall be owned by citizens of the United States, and section 2(b) is but an elaboration of the basic idea of section 2(a) designed to guard against trusts and other devices which might be employed to vest control in non-citizens. All four of its requirements were met by United. The majority of the stock of United was at all times in citizens, the majority of the voting power was in citizens, there was no contract or understanding by which the majority of the voting power could be exercised in behalf of a non-citizen, and control of the corporation was not conferred upon or permitted to be exercised by non-citizens. At all times the control of the corporation was in the hands of its directors, who were substantial and upstanding citizens of the United States, and who owned the stock by which they could hold themselves in office. The fact that they had paid an insignificant sum for the stock is immaterial; for the ownership of the stock gave them absolute control of the corporation which any court would recognize and enforce. The amount paid for class A stock was likewise an insig-

---

2. The 1918 amendment to section 9 of the Shipping Act added section 37 of the act in its present form, requiring the approval of the Commission for a transfer of a controlling interest or the majority of the voting power in a corporation owning a vessel; but this applies only in time of a national emergency and specifically provides, not for the forfeiture of the vessel, but for the forfeiture of the stocks or bonds transferred. In the hearings had on the passage of the 1918 amendment, Mr. Berling, counsel for the Shipping Board, made the following statement with respect to the proposed addition of section 37: " * * * You see the original act prohibited a ship from being transferred to a corporation which is owned abroad, but there is nothing in the act to prevent foreigners from coming in and buying all the stock. You can organize a corporation the stock of which is owned by Americans, and as soon as it is organized you can go to work and have that stock transferred to foreigners and thereby defeat the spirit of the law, and this forbids that any such stock shall be so transferred." (Hearing before House Merchant Marine and Fisheries Committee, 65th Cong. 2d Sess., April 1918).

nificant amount compared with the business in which the corporation was engaged. The capital upon which the corporation was operating was obtained from loans; and there is nothing in the statute or its history to indicate that the sort of control which a creditor has over his debtor would suffice to nullify for the purposes of the statute the legal control inherent in stock ownership.

There is nothing in the record to justify the contention that the stock held by citizens of the United States was held by them in trust for non-citizens. On the contrary, the evidence is that the corporation was set up for the purpose of complying with the statute and there is nothing to justify an inference that United States citizens who accepted its stock were engaged in an attempt to evade the law or to perpetrate a fraud upon the government. And I find nothing in the record to justify a finding that United was in fact dominated and controlled by the Chinese. No such inference can be drawn from the fact that the Chinese procured or furnished funds with which the corporation operated or that a number of Chinese were employed in its operations. The Chinese, of course, arranged for financing the purchase and operation of the vessel; but any conclusion as to control which might ordinarily be deducible from this circumstance is nullified by the fact that they and their counsel thoroughly understood that to secure a vessel from the Maritime Commission under the circumstances then existing a corporation must be controlled by citizens of the United States; and it was intended that, notwithstanding the financing by the Chinese, unfettered control should rest with the citizens to whom the class B stock was issued and who held it in absolute ownership and not under a trust in favor of anyone. So far as the carrying on of the business of the corporation was concerned, this consisted for the greater part in the management and operation of vessels upon which bareboat charters were held, and such operation and management was in the hands of Sieling and Jarvis, American shipping agents. I think, therefore, that United was a citizen within the meaning of the statute; but, as pointed out above, I do not think that the citizenship of United is vital in the decision of the case, since the corporations which owned the vessel, National and Meacham, unquestionably complied with the citizenship requirements of the statute.

It is argued that the provision of the Shipping Act is unconstitutional. Since the act forbids the transfer of a vessel from a citizen to a non-citizen without the approval of the Maritime Commission and since no standards are prescribed for the guidance of the Commission in the exercise of the discretion thus vested in it, a grave question arises as to whether this is not an unconstitutional delegation of Congressional power which would render void the section of the act here relied on. See Panama Refining Co. v. Ryan, 293 U.S. 388, 55 S. Ct. 241, 79 L.Ed. 446.

It would seem, furthermore, that section 9 of the Shipping Act has no application here, since it applies only to the transfer of a vessel or an interest therein owned in whole or in part by a "citizen" of the United States and the United States, which owned this vessel, is not a "citizen" but the nation itself. The purpose of the act was to prevent sales by "citizens" without the approval of the Maritime Commission, not to limit the power of the government itself to make sales through the Commission.

I shall not go into these matters at length, however, since it seems clear to me that even though the statute be constitutional and be held applicable to a sale of government vessels by the Commission, no ground of forfeiture exists here for the reasons heretofore stated. It seems clear that National and Meacham, the only corporations to which transfers were made, were not non-citizen corporations within the meaning of the statute; and even if they were, the transfer to National, having been made by the Commission, could not be held a transfer without the approval of the

**554**

Commission, and if National was a noncitizen, the statute did not require that a transfer by it be approved. Upon purely legal grounds, therefore, I think the forfeiture should be denied. When equity and justice are considered, little can be said for allowing the government to retain the purchase money received for a vessel it has sold and at the same time forfeit the vessel because of the sale.