ALASKA EXCURSION CRUISES,
INC., Plaintiff,

v.

UNITED STATES of America, et al.,
Defendants.  (Two Cases)

Civ. A. Nos. 83–2366, 85–0889.

United States District Court,
District of Columbia.

May 3, 1985.

John H. Meade, Hill, Betts and Nash, Washington, D.C., for plaintiff.

Sp. Asst. U.S. Atty. Lois R. Zuckerman, Washington, D.C., for defendants.

Stuart S. Dye, Graham and James, Washington, D.C., for defendant-intervenor Westours, Inc.

## MEMORANDUM

FLANNERY, District Judge.

These consolidated cases come before the court on the parties' cross-motions for summary judgment. No. 83–2366 (the "Marad case") involves a challenge by Alaska Excursion Cruises, Inc. ("AEC") to the approval by the U.S. Maritime Commission ("Marad") of a "bareboat charter" to defendant-intervenor Westours, Inc. ("Westours"), a foreign corporation, to operate the vessel the GLACIER QUEEN in the U.S. coastwise trade. In addition to challenging the approval of the bareboat charter, AEC also challenges Marad's interpretation of that charter to allow Westours to operate a harbor tour service in Alaska's Skagway harbor in direct competition with plaintiff's harbor tour service. AEC contends that the charter allows only passenger service and that Marad's interpretation of the charter is arbitrary and capricious.

In No. 84–0889 (the "Coast Guard case"), AEC challenges the United States Coast Guard's documentation of the GLACIER QUEEN as American-owned. AEC contends that the Coast Guard's initial decision to document the vessel as American-owned was arbitrary and capricious, and alleges that the Coast Guard's subsequent refusal to open an investigation into the ownership of the GLACIER QUEEN in the face of evidence which AEC claims to show that the vessel is in fact owned by Westours was also arbitrary and capricious.

For the reasons discussed herein, the plaintiffs' motions for summary judgment shall be denied, and the motions of defendants United States Coast Guard and Marad and defendant-intervenor Westours for summary judgment shall be granted.

### I. Background

The procedural history of these consolidated cases is laid out in detail in this court's previous Memorandum. *See Alaska Excursion Cruises, Inc. v. United States of America,* 603 F.Supp. 541, 543–544 (D.D.C.1984). At that time, the court consolidated these cases, limited AEC's standing to challenge defendants' actions with respect to vessels other than the GLACIER QUEEN, upheld the authority of Marad and the Coast Guard to approve foreign operation of American-owned vessels, and granted AEC's motions to amend its complaints so that the court could consider the issue of ownership of the GLACIER QUEEN. *Id.* at 544. The latter issue, as well as the propriety of Marad's interpretation of the GLACIER QUEEN charter order as permitting a harbor tour, are the only issues still to be addressed.

As a non-U.S. citizen, as defined in section 2 of the Shipping Act of 1916, 46 U.S.C. § 802 ("section 2"), Westours is barred from owning a U.S.-flag vessel for operation in the domestic coastwise trade. 46 U.S.C. §§ 289, 883. Because Westours could not qualify as a U.S. citizen under section 2, it devised a scheme whereby the GLACIER QUEEN would be purchased by its bank, the Peoples National Bank of

Washington ("PNBW"), a U.S. citizen under section 2, and then bareboat chartered by PNBW back to Westours. This agreement was conditioned on approval by Marad of the bareboat charter by PNBW to Westours, as required for the transfer or lease of any vessel owned by a U.S. citizen to an alien. Section 9 of the Shipping Act of 1916, 46 U.S.C. § 808 ("section 9").

Under the bareboat charter, Westours has exclusive possession and control of the vessel for an initial seven-year term, after which Westours has a yearly option to renew the charter for up to ten more years. PNBW neither warranted the GLACIER QUEEN's seaworthiness nor warranted that the vessel was free of title defects that might hinder Westours' use under the bareboat charter. Westours is obligated to maintain and pay for the vessel's documentation, pay all maintenance and repair costs, pay virtually all taxes, obtain and pay for protection, indemnity, and hull insurance, and indemnify PNBW for all claims arising from the use of the GLACIER QUEEN. In the case of a total loss of the vessel, Westours is obligated to pay the charter hire, stipulated loss value and interest to PNBW, but would be allowed to keep all insurance proceeds that exceed that total amount. PNBW receives all tax benefits, and, in the event that tax benefits are recaptured, Westours is obligated to reimburse PNBW for the recaptured amount.

The terms of this arrangement between Westours and its bank, and the purpose for which PNBW sought to purchase the GLACIER QUEEN, were known to both the Coast Guard and Marad at the time that the GLACIER QUEEN was documented as American-owned and the bareboat charter to Westours was approved. Marad contends that its decision to approve the bareboat charter under section 9 was a proper exercise of its discretion to permit foreign operation of U.S.-flag vessels in the domestic coastwise trade, and that the terms of the charter were neither unusual nor suffi-

cient to constitute a transfer of "ownership." [1] Indeed, counsel for the government contended at oral argument that he could not theorize any situation in which a bareboat charter could transfer "ownership."

The Coast Guard's position is that absent some irregularity on the face of the application for documentation, there is no duty to investigate the ownership of a vessel. Here, the chain of title indicated that the GLACIER QUEEN had never been owned by an alien. Further, there was no evidence of alien control of any of the present or prior titleholders of the vessel. Defendants argue that the Coast Guard has no duty to ensure that a bareboat charter approved by Marad under section 9 does not transfer too much control over a U.S.-flag vessel to a non-citizen.

II. *Discussion*

█ Neither Marad's decision to approve the bareboat charter to Westours nor the Coast Guard's decision to document the GLACIER QUEEN as American-owned can be successfully challenged unless it can be said that the transaction between Westours and PNBW vested so many of the "indicia of ownership" in Westours that either Westours became the *de facto* owner of the GLACIER QUEEN or PNBW could not be deemed the "sole" owner of the vessel. In other words, only if the bareboat charter between Westours and PNBW can be deemed a transfer of "ownership" to a noncitizen for domestic coastwise operation can the government's decisions be deemed arbitrary and capricious or not in accordance with law.

As a threshold matter, it is necessary to address the contention that so long as legal title of a U.S.-flag vessel is vested in a *bona fide* American corporation which bears no trust or other fiduciary obligations to an alien, Marad is free to approve any nature of a charter or lease arrangement with a noncitizen, and the Coast Guard is required to grant that arrange-

---

**1.** Marad, of course, could not approve a transfer of ownership of a U.S.-flag vessel to an alien for *domestic operation, since only U.S. citizens may* own U.S.-flag vessels operated in the domestic coastwise trade. 46 U.S.C. §§ 883, 888.

ment its imprimatur, provided that that arrangement does not contemplate that legal title will ultimately vest in the noncitizen. Based on the meaning and intent of the Shipping Act, however, the court is unable to accept the position that the location of legal title is dispositive for purposes of determining ownership of a U.S.-flag vessel.

■■■ The statutory scheme regulating the relationship between noncitizens and the U.S. shipping industry and its underlying legislative history indicate a concern that foreign interests might somehow obtain clandestine control over the U.S. shipping industry and merchant marine, with the result that U.S.-flag vessels would not be readily available in times of national emergency. *See Meacham Corp. v. United States*, 207 F.2d 535, 542–43 (4th Cir. 1953); H.R.Rep. No. 568, 65th Cong., 2d Sess. 4 (1918); S.Rep. No. 536, 65th Cong., 2d Sess. 3–4 (1918); 56 Cong.Rec. 8029, 8032 (1918). To assauge this fear, and, at least in part, to protect American shipping interests from foreign competition, Congress determined that only U.S. citizens could own U.S.-flag vessels operating in the domestic trade, and imposed restrictions on the extent to which aliens could become involved with American corporations before those corporations would lose their status as "U.S. citizens." *See Meacham, supra.* Although noncitizens could *operate* U.S.-flag vessels in the domestic coastwise trade, they could do so only after obtaining Marad's approval. The issue, then, is whether Congress simply intended to preclude transfer of legal title to aliens who are operating U.S. vessels in the domestic coastwise trade, as defendants contend, or whether Congress also intended to prevent *de facto* ownership by aliens of those vessels. In light of the congressional intent to bar foreign control of the American merchant marine, and the lengths to which Congress went to insure that aliens

would not gain control of U.S. vessels through interests in American corporations, the court is unable to conclude that defendants' elevation of form over substance is a satisfactory approach to the agencies' duties under the Shipping Act. Marad cannot sanction under section 9 a bareboat charter that would vest *de facto* ownership in an alien who could not hold legal title under section 2. Similarly, the Coast Guard has the authority to refuse documentation of a vessel if the foreign control over that vessel is so complete as to constitute *de facto* foreign ownership. Indeed, the Coast Guard has in the past recognized its duty to refuse documentation when the underlying transaction and subsequent agreements between the "owner" and the charterer are such that it can be said that the titleholder is not the "true" owner. *See* Memorandum of Points and Authorities in Support of Alaska Excursion Cruises, Inc.'s Motion for Summary Judgment, Shell case, Exhibit 12 at 1 [hereinafter cited as "Shell case"]. Moreover, the Coast Guard cannot avoid this duty to refuse or rescind vessel documentation of a vessel "owned" by a noncitizen simply because the foreign control derives from a charter approved by Marad under section 9.[2] Both agencies have a responsibility to ensure that noncitizens do not become owners—either by obtaining title, or through a sale-leaseback or a bareboat charter arrangement—of U.S.-flag vessels when such ownership would be prohibited by the Shipping Act. Because the court cannot agree that it is impossible for a bareboat charter to transfer "ownership" for purposes of the restrictions on foreign ownership in the Shipping Act, the challenged actions cannot be upheld simply because legal title remained with PNBW.

■■■ Legal title, therefore, is not dispositive of the issue of ownership under the Shipping Act. The court thus turns to

---

**2.** The authority to reject or rescind vessel documentation on the basis that a Marad-approved charter would, in effect, transfer "ownership" to a noncitizen would not "nullify" Marad's authority to approve bareboat charters, as defendants

contend. Instead, Marad would only be constrained from approving those charters which transfer so many of the indicia of ownership as to vitiate the ban on foreign ownership of U.S.-flag vessels.

**1088**

whether the determination by the Coast Guard and Marad that this bareboat charter did not transfer ownership to a noncitizen was arbitrary or capricious. After careful consideration of the terms and conditions of the bareboat charter, particularly in comparison with the terms of the charter under which vessel documentation was rejected in the Shell case, *supra,* the court is unable to hold that defendants' conclusion that the terms of the transaction did not render Westours the "owner" of the GLACIER QUEEN within the meaning or intent of the Shipping Act was arbitrary or capricious.

■ Aside from the individual terms of the charter itself, plaintiff points to the purpose of the transaction by which PNBW became the titleholder of the GLACIER QUEEN and several statements made by Westours to AEC and to Marad and the Coast Guard as indicative of the vessel's true "ownership." As both Marad and the Coast Guard recognized, the only reason that PNBW agreed to purchase the GLACIER QUEEN was to bareboat charter it to Westours, allowing Westours to avoid the bar to foreign ownership. There is nothing insidious, however, about purchasing a vessel with the intent of chartering it for operation by a noncitizen corporation which could not own the vessel in its own right. Nothing in the Shipping Act precludes a U.S. citizen from buying a vessel for the sole purpose of chartering it to another person, even if the U.S. owner never intends to operate the vessel itself, so long as Marad's approval is obtained prior to leasing the vessel to a noncitizen. *See* 46 U.S.C. §§ 289, 802, 808; *Alaska Excursion Cruises, Inc. v. United States of America,* 603 F.Supp. 541, 548 (D.D.C. 1984); *Alaska Excursion Cruises, Inc. v. United States,* 595 F.Supp. 14, 16 (D.D.C. 1984). In sum, while control by a noncitizen under a bareboat charter is not *per se* legal simply because title remains in a *bona fide* U.S. citizen, a bareboat charter to a noncitizen is not *per se* illegal simply because such an arrangement typically transfers a considerable degree of control over the chartered vessel. The particular terms and conditions of the bareboat charter will indicate whether so many of the indicia of ownership have been transferred that the charterer has become the "owner" for purposes of the Shipping Act.

■ AEC also places considerable emphasis on the designation of the owner and its address as "Peoples National Bank of Washington, c/o Westours," with Westours' Juneau, Alaska address, in the documents submitted to the Coast Guard for vessel documentation. Given Westours' obligation to maintain current documentation for the GLACIER QUEEN, and the Coast Guard's own regulations which permit home-port designation to be made on the basis of the charterer's address rather than that of the owner in the case of a long-term bareboat charter, 46 C.F.R. §§ 67.45–5, 67.13–3 (1984), the designation of PNBW's address as "c/o Westours" does not appear particularly significant. Similarly insignificant is Westours' willingness to engage in negotiations for the sale of the GLACIER QUEEN with AEC, rather than referring AEC to PNBW. Clearly, the language used by Westours in its correspondance with AEC is what one would expect in negotiations between an owner and a prospective buyer. However, the legal status of Westours' interest in the GLACIER QUEEN cannot be determined on the basis of inartful language in a letter from one of Westours' officers.

Individually, these factors are clearly insufficient to demonstrate that Westours is the *de facto* "owner" of the GLACIER QUEEN. Even in conjunction with the terms of the bareboat charter, however, they provide evidence which is insufficient to establish that the bareboat charter worked a transfer of ownership of the vessel such that approval of the charter by Marad and vessel documentation by the Coast Guard violated the Shipping Act as a matter of law.

Considerable emphasis has been placed on the Coast Guard's decision in the Shell case, *supra,* to refuse to document vessels sold by a foreign corporation to U.S. corpo-

rations and then chartered back to the foreign corporation. Although the transaction involved a transfer of legal title, such that the U.S. corporations would have been the legal "owners" of the vessels, the Coast Guard concluded that the sales and the charters, taken as a whole, allowed the foreign corporation to retain so much control that it could also be considered an "owner." Like PNBW, the U.S. firms divested themselves of almost all control over the vessels, with their primary functions being to furnish their names as titleholders and to act as financing intermediaries. In looking to the "substance" of the transaction rather than its "form," the Coast Guard determined that Shell, the foreign corporation, must be viewed as an owner for purposes of the Shipping Act.

The presence of the foreign corporation in the chain of title of the tankers is an insufficient basis to distinguish the Shell case from the case at bar. The charter arrangement itself, however, contains elements which indicate that the American titleholders of the vessels in Shell were to obtain significantly less of an interest in the tankers than PNBW obtained in the GLACIER QUEEN. Most significant are Shell's unilateral right to extend the charter indefinitely or terminate it and buy the tankers back at any time, as well as Shell's obligation to buy them back at the termination of the charter for a sum which was anticipated to be substantially less than the fair market value of the vessels. Under the PNBW-Westours charter, in contrast, PNBW retains several important rights, including reversion to the bank at the expiration of the charter, which constitutes an absolute right to the GLACIER QUEEN at the end of as little as seven or no more than seventeen years. Further, PNBW retains all tax benefits which result from ownership, and may require Westours to reimburse it if tax benefits are recaptured. Westours has no right to assign its charter to a third party without PNBW's consent; nor can Westours terminate the charter for seven years. Finally, unlike the Shell case, where the American corporations were set up solely to take title for the foreign corpo-

ration, it cannot be said here that PNBW is a mere "front" for Westours. Instead, the bareboat charter negotiated between Westours and its bank was an arms-length transaction in which, it may be assumed, PNBW extracted what it believed to be a reasonable profit for its participation, just as any American owner would extract a reasonable profit from a bareboat charter of its vessel.

Just as PNBW retained rights in the GLACIER QUEEN that would be expected of an owner, Westours' rights and obligations are limited in several significant ways to those one would expect of a charterer. Westours does not have the right to extend the charter indefinitely. At the end of the term of the charter, which Westours may terminate after seven years or yearly thereafter, and which terminates of its own terms after seventeen years, Westours has neither the right nor the obligation to purchase the GLACIER QUEEN. Westours has no right to terminate the charter prior to the expiration of the initial seven-year term. Finally, Westours has no right to demand that PNBW pass the investment tax credits on to Westours.

It is unnecessary for the court to determine precisely which of the factors present in the Shell case would convert the transaction between Westours and PNBW into a transfer of ownership for purposes of the Shipping Act. That determination is within the jurisdiction of Marad and the Coast Guard. Those agencies may well determine that the Shell case represents the threshold beyond which a titleholder can no longer be said to be the "sole" owner of a U.S.-flag vessel. Instead, they may decide that the PNBW-Westours charter represents the most that a titleholder can transfer to a charterer before the charterer is also deemed an owner under the Shipping Act, or they may decide that the line between a sale and a charter lies somewhere between the Shell case and the PNBW-Westours arrangement. Although the court rejects the argument that those agencies lack the duty to prevent approval or documentation of transfers which result in

*de facto* ownership by a noncitizen, the court is unable to conclude that the bareboat charter between Westours and PNBW transformed Westours from a charterer to a *de facto* owner as a matter of law. Wherever the line between a charterer and an owner is ultimately drawn, it is sufficient to conclude that the agencies have not acted arbitrarily or capriciously in determining that Westours has not crossed it.

■ For these reasons, the approval of the PNBW-Westours bareboat charter by Marad and the Coast Guard's documentation of the GLACIER QUEEN as American-owned will be upheld. Similarly, the court is unable to conclude that the Coast Guard's refusal to initiate an investigation into the ownership of the GLACIER QUEEN was arbitrary or capricious. *See General Motors v. Federal Energy Regulatory Commission,* 613 F.2d 939, 944 (D.C.Cir.1979).

In addition to challenging approval of the bareboat charter to Westours, AEC also challenges Marad's approval of Westours' February 11, 1983 request that the bareboat charter be interpreted to allow the GLACIER QUEEN to engage in a local harbor tour service. Charter Order MA–5258 had approved the bareboat charter to Westours

> of the passenger ferry GLACIER QUEEN.... for the carriage of passengers with baggage—Prince William Sound between Valdez and Whittier, Alaska, and or Lynn Canal between Yankee Cove (35 miles north of Juneau, Alaska) and Skagway, Alaska.

On May 23, 1983, Marad agreed in principle with Westours that Charter Order Ma–5258 allowed expansion of the GLACIER QUEEN's service to include a harbor tour as this proposed service came within the "geographic scope" of operations of Charter Order MA–5258. AEC challenges this conclusion on the ground that the plain meaning of the Charter Order was to allow the GLACIER QUEEN to be used as a "passenger ferry" to carry "passengers with baggage" across the Prince William Sound with "point-to-point" transportation

between Valdez and Whittier, Alaska and/or along the Lynn Canal between Yankee Cove and Skagway, Alaska. AEC contends that the use of the term "passenger ferry" demonstrates that the Charter Order permitted only ferry transportation service within the specified geographic area, and not that Westours was granted general authority to conduct any type of service within the geographic limitations of MA–5258. Therefore, plaintiff contends, because the harbor tour service constituted a new service, it required a new approval and a new charter order. For the same reason, Marad's reliance on its original justifications for approving MA–5258 was arbitrary and capricious and denied AEC its right to challenge the approval of the "new" service by Marad.

■ The court is unable to conclude, however, that Marad's interpretation of the charter order was either unreasonable or clearly erroneous. Marad's position is that the term "passenger ferry" does not describe the intended *service* of the vessel, but rather provides a *classification* of the GLACIER QUEEN to distinguish it from larger vessels that would include sleeping accommodations for the passengers. This interpretation is supported by the fact that the term "passenger ferry" is used only to describe the vessel and does not appear in the description of the *service* to which the GLACIER QUEEN is to be put. Therefore, the government's position that reference to the vessel as a "passenger ferry" does not create a use limitation or imply that the vessel may be used only for point-to-point transportation and not for harbor tours does not appear to be irrational. By interpreting the charter order to describe the geographic area within which the GLACIER QUEEN could operate, rather than reading it to impose restrictions on how the vessel could be operated within that geographic area, Marad was exercising its discretion so as to allow Westours to adapt to the changing needs of the Alaska tourist market. Marad's discretion in this regard is quite broad. *Cf. Carolina Freight Carriers Corp. v. Interstate Commerce*

*Comm'n,* 627 F.2d 563, 565 (D.C.Cir.1980). In light of the reasonableness of this interpretation, Congress' explicit recognition of the unique circumstances in southeastern Alaska, and Marad's broad authority to regulate foreign operation of domestic vessels, AEC's challenge to the agency's interpretation of Charter Order MA–5258 must be rejected.